UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARK INESTI,                                                  :

               Plaintiff,                        :

           -against-                              :

MICHAEL HOGAN, Ph D; STEVEN                     :
RABINOWITZ, Dir. of Kirby and (MPC); TOM
TUZEL, M.D.; DUNBAR, Capt. at GRVC;             :
PRESSLEY, Capt. at GRVC,

                          :

              Defendants.                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11 Civ. 2596 (PAC) (AJP)

**REPORT AND RECOMMENDATION**

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Paul A. Crotty, United States District Judge:**

               Pro se plaintiff Mark Inesti (a/k/a Hector Ortiz) brings this § 1983 action alleging

violations of his federal constitutional rights by New York City and New York State officials.  Inesti

asserts claims against Captain Sherma Dunbar (now Assistant Deputy Warden) and Captain Anna

Pressley ("City defendants") arising out of alleged conditions of his confinement and failure to treat

his mental illness while he was held in the Mental Health Assessment Unit for Infracted Inmates

("MHAUII") at the George R. Vierno Center ("GRVC") on Rikers Island.  (Dkt. No. 38: Compl.

¶¶ 5-6, 16-40, 79-86, 90-92, 94-96, 104-05, 138, 143-44.)[1/]  Inesti also raises claims against former

Office of Mental Health Commissioner Michael Hogan, former Manhattan Psychiatric Center

("MPC") Executive Director Steven Rabinowitz, and staff psychiatrist Dr. Tom Tuzel ("State

---

[1/]     All references in this Report and Recommendation to "Compl." are to the Second Amended
Complaint, unless otherwise noted.  Defendants Dunbar and Pressley were incorrectly
named in the Second Amended Complaint as "Dubar" and "Presseley."  (Compl. at 1.)

defendants") arising from his treatment in the MPC from September 2007 to November 2007 and the Kirby Forensic Psychiatric Center ("Kirby") from November 2008 to January 2009, facilities operated by the New York State Office of Mental Health ("OMH").  (Compl. ¶¶ 3-4, 9, 41-74, 81, 85-89, 106-07, 112-14, 117-35, 139-40.)  Presently before the Court are defendants' summary judgment motions.  (Dkt. Nos. 78, 87.)  For the reasons stated below, the City and State defendants' summary judgment motions should be GRANTED.

**FACTS** [2]

---

[2]     Although both the City and State defendants provided Inesti with the required notice pursuant to SDNY-EDNY Local Civil Rule 56.2 (Dkt. Nos. 79, 95), Inesti failed to comply with Local Civil Rule 56.1(b).  Accordingly, the Court can and does rely on the City and State defendants' Rule 56.1 Statements.

> "Courts in this circuit have not hesitated to deem admitted the facts in a movant's Local [Civil] Rule 56.1 Statement that have not been controverted by a Local Rule 56.1 statement from the non-moving party."  Gadsden v. Jones Lang Lasalle Ams., Inc., 210 F. Supp. 2d 430, 438 (S.D.N.Y. 2002) (collecting cases) . . . .

Ballard v. Children's Aid Soc'y, 781 F. Supp. 2d 198, 202-03 (S.D.N.Y. 2011); accord, e.g., Wolfson v. Bruno, 844 F. Supp. 2d 348, 350-51 n.4 (S.D.N.Y. 2011) (Peck, M.J.); Newsome v. Artale, 09 Civ. 10196, 2011 WL 5172543 at *1 n.1 (S.D.N.Y. Nov. 1, 2011) ("Plaintiff's affidavit in opposition does not specifically controvert the relevant facts set forth in Defendants' Rule 56.1 submission, and thus the Court deems admitted the facts recounted in Defendants' statement."); Crawford-Bey v. N.Y. & Presbyterian Hosp., 08 Civ. 5454, 2011 WL 4530193 at *1 n.1 (S.D.N.Y. Sept. 30, 2011) ("Because Plaintiff failed to submit her own [Local Civil Rule] 56.1 statement, despite specific prompting from the Court, the facts set forth in Defendant's 56.1 statement . . . are deemed admitted."); Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 n.42 (S.D.N.Y. 2011) (Local Civil Rule "56.1 statements not explicitly denied by plaintiff are deemed admitted."); Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals, 812 F. Supp. 2d 357, 361 n.2 (S.D.N.Y. 2011) ("[A]ny facts averred in Plaintiff's Rule 56.1 submission that are supported by the record and not specifically and expressly controverted by properly supported statements in Defendants' Reply Memorandum [are considered] to be admitted by Defendants."); Butler v. Gonzalez, 09 Civ. 1916, 2010 WL 3398156 at *6 (S.D.N.Y. May 18, 2010), report & rec. adopted, 2010 WL 3398150 (S.D.N.Y. Aug. 26, 2010) (Crotty, D.J.).

The background facts underlying this dispute are set forth in the Court's prior Report and Recommendation, familiarity with which is assumed.  See <u>Inesti</u> v. <u>Hicks</u>, 11 Civ. 2596, 2012 WL 2362626 (S.D.N.Y. June 22, 2012) (Peck, M.J.), <u>report & rec. adopted</u>, 2012 WL 3822224 (S.D.N.Y. Sept. 4, 2012) (Crotty, D.J.).

**<u>The City Defendants</u>**

Beginning in 2007, Captain Anna Pressley was assigned to MHAUII's Housing Area 13.  (Dkt. No. 84: City Defs. Rule. 56.1 Stmt. ¶ 2; Dkt. No. 83: Dunbar Aff. ¶ 5.)  Captain Sherma Dunbar was assigned to MHAUII's Housing Area 11 beginning in June 2008.  (City Defs. Rule 56.1 Stmt. ¶ 1; Dunbar Aff. ¶ 4.)  MHAUII correction officers manage inmates' food, showers, and recreation time, but not medication, which is dispensed by medical staff twice a day.  (City Defs. Rule. 56.1 Stmt. ¶¶ 5-6; Dunbar Aff. ¶¶ 8-9.)  Food is served three times a day, generally between 5 a.m. and 6 a.m., 11 a.m. and noon, and 5 p.m. and 6 p.m.  (City Defs. Rule. 56.1 Stmt. ¶ 7; Dunbar Aff. ¶ 10.)  If an inmate refuses food, the matter is referred to the mental health department.  (City Defs. Rule. 56.1 Stmt. ¶ 7; Dunbar Aff. ¶ 10.)  While showers are offered daily, inmates may refuse a shower or be denied one if they fail to comply with security procedures.  (City Defs. Rule. 56.1 Stmt. ¶ 8; Dunbar Aff. ¶ 11.)  MHAUII inmates are allowed one hour of out-of-cell recreation daily; inmates may refuse recreation or be denied recreation for failing to comply with security procedures.  (City Defs. Rule. 56.1 Stmt. ¶ 9; Dunbar Aff. ¶ 12.)  Searches of an inmate's person are only conducted when an inmate returns after having left the housing area or when an area-wide search for a particular purpose is required.  (City Defs. Rule. 56.1 Stmt. ¶ 10; Dunbar Aff. ¶ 13.)

On November 16, 2006 while in jail at Rikers Island, Inesti was sent to GRVC MHAUII Housing Area 11 of as a result of a disciplinary infraction.  (City Defs. Rule 56.1 Stmt.

¶ 15; Dkt. No. 81: DiCarlo Aff. ¶ 6 & Ex. H: Inesti Infraction History at 2; DiCarlo Aff. Ex. I: Inesti Movement History at 1-3.)  On January 16, 2007, Inesti was discharged from MHAUII and City Department of Correction ("DOC") custody.  (City Defs. Rule 56.1 Stmt. ¶ 18; DiCarlo Aff. Ex. I: Inesti Movement History at 4.)

On August 8, 2008, Inesti was arrested for attempting to steal clothing from a department store and admitted to Rikers Island.  (City Defs. Rule 56.1 Stmt. ¶¶ 23-24; DiCarlo Aff. Ex. J: Det. Alfonso Aff.)  From August 9, 2008 to September 12, 2008, Inesti was housed in the Anna M. Kross Center ("AMKC") on Rikers Island.  (City Defs. Rule 56.1 Stmt. ¶¶ 24, 26; DiCarlo Aff. Ex. I: Inesti Movement History at 5-6.)  From September 12, 2008 to October 2, 2008, Inesti was housed in non-punitive dormitories at the Otis Bantum Correctional Center ("OBCC").  (City Defs. Rule 56.1 Stmt. ¶ 26; DiCarlo Aff. Ex. I: Inesti Movement History at 7-8.)  On October 2, 2008, Inesti was sent to Bellevue Hospital Prison Ward where he was psychiatrically evaluated pursuant to a C.P.L. Article 730 Order; Inesti was released back to OBCC on October 15, 2008. (City Defs. Rule 56.1 Stmt. ¶ 27; Dkt. No. 80: Carey 12/10/12 Aff. Ex. C: C.P.L. Art. 730 Exam. of Inesti; DiCarlo Aff. Ex. I: Inesti Movement History at 8.)

Inesti was found guilty of an assault on DOC staff with a weapon on October 19, 2008 and sent to MHAUII Housing Area 13-A.  (DiCarlo Aff. Ex. H: Inesti Infraction History at 2; DiCarlo Aff. Ex. I: Inesti Movement History at 9.)  In relation to his incarceration at MHAUII Housing Area 13-A, Inesti testified:  "I wasn't really too stable or anything.  I was argumentative and probably even abusive or violent because of what I was going through or not taking any medication, or anything like that, or getting any mental health treatment."  (City Defs. Rule 56.1

Stmt. ¶ 29; Carey 12/10/12 Aff. Ex. A: Inesti Dep. at 32, 46-47, 60; <u>see also</u> Dkt. No. 91: Buskin Aff. Ex. A: Inesti Dep. at 93-94, 134-35.)

"The log book from Housing Area 13-A during the relevant time period clearly shows that Mr. Inesti was entitled to and offered three meals a day, regular sanitation, access to showers, out-of-cell relief, and medication (which he admits he sometimes refused)." (City Defs. Rule 56.1 Stmt. ¶ 30; Dkt. No. 82: Kril Aff Ex. L: GRVC 13-A Logbook.)   Deviations from standard procedure would be noted in the logbook.  (City Defs. Rule 56.1 Stmt. ¶ 31; <u>see generally</u> Kril Aff. Ex. L: GRVC 13-A Logbook.)  On October 22, 2012, Inesti missed lunch because there was not enough food on the meal cart.  (City Defs. Rule 56.1 Stmt. ¶ 31; Kril Aff. Ex. L: GRVC 13-A Logbook at 35.)  Inesti, however, also claims that he only received one meal a day, dinner, because of Captains Dunbar and Pressley.  (Carey 12/10/12 Aff. Ex. A: Inesti Dep. at 35.)  Inesti's claim is contradicted by the logbook.  (Kril Aff. Ex. L: GRVC 13-A Logbook.)  On several occasions, Inesti refused recreation.  (Kril Aff Ex. L: GRVC 13-A Logbook at 30, 39, 43, 51, 55, 59, 64, 69, 76, 81, 89, 93-94, 98, 119, 132, 136, 150, 163, 167, 171, 179, 184.)

When Inesti was deemed unfit for trial, he was released from MHAUII into the custody of OMH and sent to Kirby on November 26, 2008.  (City Defs. Rule 56.1 Stmt. ¶¶ 35-36; Carey 12/10/12 Aff. Ex. D: 11/21/08 Order of Commitment; Carey 12/10/12 Aff. Ex. E: Kirby Discharge Psychiatric Records at 18; DiCarlo Aff. Ex. I: Inesti Movement History at 10.) Subsequently, Inesti was deemed fit to stand trial and returned to Rikers on January 27, 2009.  (City Defs. Rule 56.1 Stmt. ¶ 40; Carey 12/10/12 Aff. Ex. E: Inesti Med. Records at 18-20.)

**The State Defendants**

On September 24, 2007, Inesti was admitted to MPC pursuant to a final C.P.L. Article 730 Order.  (Dkt. No. 96: State Defs. Rule 56.1 Stmt. ¶ 5; Dkt. No. 90: Rabinowitz Aff. ¶ 3.) During this period of commitment, Inesti wrote to OMH Commissioner Hogan complaining that MPC nurses were injecting him with psychotropic medication.  (State Defs. Rule 56.1 Stmt. ¶¶ 2, 7; Dkt. No. 91: Buskin Aff. Ex. A: Inesti Dep. at 103-05.)  Inesti never received a response from Commissioner Hogan, and OMH has no record of Inesti's letter to Commissioner Hogan.  (State Defs. Rule 56.1 Stmt. ¶¶ 8-9; Buskin Aff. Ex. A: Inesti Dep. at 104; Dkt. No. 92: Blasen Aff. ¶¶ 2-3; Dkt. No. 93: Flagler Aff. ¶¶ 2-3; Dkt. No. 94: McNamara Aff. ¶¶ 2-3.)  Inesti also made several complaints to Dr. Rabinowitz, the Executive Director of MPC and Kirby.  (State Defs. Rule 56.1 Stmt. ¶¶ 3, 10; Buskin Aff. Ex. A: Inesti Dep. at 108-10, 112-13.)  As a result, Rabinowitz "called [Inesti] to his office and [Rabinowtiz] gave [Inesti] the transitional services that [Inesti] requested for a treatment plan."  (Buskin Aff. Ex. A: Inesti Dep. at 113; id. at 108-10, 115, 123; State Defs. Rule 56.1 Stmt. ¶ 11.)  Accordingly, Inesti was transferred to MPC's Transitional Living Residence ("TLR") on November 23, 2007.  (State Defs. Rule 56.1 Stmt. ¶¶ 11-12; Rabinowitz Aff. ¶ 3; Buskin Aff. Ex. A: Inesti Dep. at 108-10, 113.)  Inesti subsequently struck a TLR nurse and was arrested for assault.  (State Defs. Rule 56.1 Stmt. ¶ 14; Buskin Aff. Ex. A: Inesti Dep. at 83.)  Inesti never saw Rabinowitz again after leaving MPC.  (State Defs. Rule 56.1 Stmt. ¶ 13; Buskin Aff. Ex. A: Inesti Dep. at 115.)

On November 21, 2008, Inesti was ordered to the custody of OMH after being indicted for robbery and found unfit for trial.  (State Defs. Rule 56.1 Stmt. ¶ 15; Buskin Aff. Ex. B: Commitment Order.)  On November 26, 2008, pursuant to a C.P.L. Article 730 Order, Inesti was

admitted to Kirby where Dr. Tuzel was his treating doctor.  (State Defs. Rule 56.1 Stmt. ¶¶ 16-17; Rabinowitz Aff. ¶ 3; Dkt. No. 89: Tuzel Aff. ¶ 4.)  Inesti received psychotropic intramuscular medication on four occasions while at Kirby, three of which were administered without Inesti's consent.  (State Defs. Rule 56.1 Stmt. ¶¶ 18-19; Tuzel Aff. ¶ 6 & Ex. B: Inesti Med. Records.)

Dr. Tuzel was personally involved only in one instance of Inesti receiving pshycotropic intramuscular medication without consent.  (State Defs. Rule 56.1 Stmt. ¶ 21; Tuzel Aff. ¶ 6.)  On December 26, 2008, Inesti complained that he was feeling "'anxious,' 'nervous,' and 'irritable.'"  (State Defs. Rule 56.1 Stmt. ¶ 22; Tuzel Aff. ¶ 8 & Ex. B: Inesti Med. Records at 204-05.)  At 11:30 a.m., Inesti became "'irritable,' 'loud,' and 'angry'" and requested a second dose of medication.  (State Defs. Rule 56.1 Stmt. ¶ 23; Tuzel Aff. ¶ 8 & Ex. B: Inesti Med. Records at 204-05.)  Inesti went to Dr. Tuzel's office and was yelling and screaming.  (State Defs. Rule 56.1 Stmt. ¶ 24; Tuzel Aff. ¶ 8 & Ex. B: Inesti Med. Records at 204-05.)  Inesti was offered and refused intramuscular medication.  (State Defs. Rule 56.1 Stmt. ¶ 25; Tuzel Aff. ¶ 8 & Ex. B: Inesti Med. Records at 204-05.)  Concluding that Inesti presented a danger to himself and others due to his hostile and violent behavior, Dr. Tuzel ordered that Inesti be given Lorazepam for anxiety, Haloperidone for schizophrenia symptoms, and Diphenhydramine, a sleep aid.  (State Defs. Rule 56.1 Stmt. ¶ 26; Tuzel Aff. ¶ 8 & Ex. B: Inesti Med. Records at 204-05.)  While Inesti acknowledges that he can become violent when he does not take his medication, he does not recall if he was violent when he was medicated on December 26, 2009, but concedes that he was not "'stable.'"  (State Defs. Rule 56.1 Stmt. ¶¶ 27-28; Buskin Aff. Ex. A: Inesti Dep. at 134-36.)  Inesti also conceded that the injections stabilized and calmed him.  (Buskin Aff. Ex. A: Inesti Dep. at 136.)

On December 22 and 29, 2008, Inesti also received psychotropic injections without his consent, but these injections were not ordered or administered by Dr. Tuzel. (State Defs. Rule 56.1 Stmt. ¶ 29; Tuzel Aff. ¶ 9 & Ex. B: Inesti Med. Records at 192, 209.) On January 12, 2009, Inesti consented to and received psychotropic intramuscular medication. (State Defs. Rule 56.1 Stmt. ¶ 32; Tuzel Aff. ¶ 10 & Ex. B: Inesti Med. Records at 242.) By January 14, 2009, Inseti's standing order for pshychotropic medication was discontinued, but Inesti continued to request and receive Risperidone. (State Defs. Rule 56.1 Stmt. ¶¶ 33-34; Tuzel Aff. ¶¶ 11, 13-14 & Ex. B: Inesti Med. Records at 249-50; Tuzel Aff. Ex. C: Discharge Summary at 275.) On January 21, 22, 23, and 26, 2009, Inesti requested and received Risperidone. (State Defs. Rule 56.1 Stmt. ¶¶ 36-40; Buskin Aff. Ex. D: Inesti Med. Records at 263, 269-71, 273.)

On January 5, 2009, Kirby forensic psychiatrists determined that Inesti was competent to stand trial. (State Defs. Rule 56.1 Stmt. ¶ 30; Rabinowitz Aff. Ex. A: Model Report in Support of Competency Restoration.) On January 15, 2009, the New York Supreme Court ordered Inesti to be delivered to DOC custody and to appear in court on January 28, 2009. (State Defs. Rule 56.1 Stmt. ¶ 35; Buskin Aff. Ex. C: Order to Produce.) On January 27, 2009, Inesti was discharged from Kirby. (State Defs. Rule 56.1 Stmt. ¶ 41; Tuzel Aff. ¶ 4; Rabinowitz Aff. ¶ 3.)

Inesti never wrote Commissioner Hogan regarding his treatment at Kirby. (State Defs. Rule 56.1 Stmt. ¶ 42; Buskin Aff. Ex. A: Inesti Dep. at 105.) While at Kirby, Inesti wrote one or two letters to Rabinowitz but never spoke with Rabinowitz regarding his treatment. (State Defs. Rule 56.1 Stmt. ¶¶ 43-44; Buskin Aff. Ex. A: Inesti Dep. at 115-16, 145-46.) Rabinowitz did not make the determination that Inesti was competent to stand trial or sign the corresponding paperwork. (State Defs. Rule 56.1 Stmt. ¶¶ 45-46; Rabinowitz Aff. ¶ 8 & Ex. A: Notification of Fitness to

Proceed.)  Rabinowitz had no intent to retaliate against Inesti for any complaints that Inesti made.  (State Defs. Rule 56.1 Stmt. ¶ 47; Rabinowitz Aff. ¶ 6.)

On February 25, 2010, Inesti was convicted and sentenced to twenty years to life imprisonment.  (State Defs. Rule 56.1 Stmt. ¶ 48.)  See New York v. Inesti, 95 A.D.3d 690, 944 N.Y.S.2d 148 (1st Dep't), appeal denied, 19 N.Y.3d 1026, 953 N.Y.S.2d 559 (2012).

## Procedural History

Inesti mailed his original complaint from the Clinton Correctional Facility, but listed his address as Downstate Correctional Facility.  (Dkt. No. 2: Orig. Compl. at 1.)  Inesti's original complaint was signed on April 20, 2010 (id. at 14), but the mailing envelope was postmarked April 7, 2011.  Inesti does not indicate when he gave his original complaint to prison officials for delivery to the Court.  The Court received Inesti's original complaint on April 12, 2011.  (Id. at 1.)

The City and State defendants moved to dismiss Inesti's Second Amended Complaint.  (Dkt. Nos. 40, 42.)  The Court granted in part and denied in part the motions to dismiss.  See Inesti v. Hicks, 11 Civ. 2596, 2012 WL 2362626 (S.D.N.Y. June 22, 2012) (Peck, M.J.), report & rec. adopted, 2012 WL 3822224 (S.D.N.Y. Sept. 4, 2012) (Crotty, D.J.).

Presently before the Court are the City and State defendants' motions for summary judgment on the remaining claims in Inesti's second amended complaint.  (Dkt. Nos. 78, 87.)

The State defendants' summary judgment motion argues that:  (1) Inesti's claims arising out his incarceration at MPC are time-barred, (2) Hogan was not personally involved in the alleged deprivation of Inesti's rights, (3) Rabinowitz was not personally involved in the alleged deprivation of Inesti's rights and did not retaliate against Inesti, (4) Dr. Tuzel did not violate Inesti's

rights, and (5) the State defendants are entitled to qualified immunity.  (See Dkt. No. 88: State Defs. Br.; Dkt. No. 104: State Defs. Reply Br.)

The City defendants' summary judgment motion argues, inter alia, that:  (1) Inesti's claims against Dunbar and Pressley arising out of his first period of incarceration at MHAUII are time-barred, (2) Inesti failed to exhaust his administrative remedies, and (3) the City defendants were not deliberately indifferent to Inesti's confinement conditions or medical needs.  (See Dkt. No. 85: City Defs. Br.; Dkt. No. 105: City Defs. Reply Br.)

**ANALYSIS**

**I.    SUMMARY JUDGMENT STANDARD**

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Lang v. Ret. Living Pub. Co., 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment.  See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Instead, the non-moving party must "cit[e] to particular parts of materials in the record" to show that "a fact . . . is generally disputed." Fed. R. Civ. P. 56(c); see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct. at 1356; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (At summary judgment, "[t]he time has come . . . 'to put up or shut up.'" (citations omitted)), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[3/] The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented. See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v.

---

[3/]     See also, e.g., Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223.

U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g., Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

"The Court recognizes that it must extend extra consideration to pro se plaintiffs" and that "pro se parties are to be given special latitude on summary judgment motions."  Salahuddin v. Coughlin, 999 F. Supp. 526, 535 (S.D.N.Y. 1998) (Peck, M.J.) (citations & quotations omitted); see, e.g., McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (a pro se party's pleadings should be read liberally and interpreted "'to raise the strongest arguments that they suggest'").[4]  "Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  Cole v. Artuz, 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) (citing cases).[5]

---

[4]  See also, e.g., Ferran v. Town of Nassau, 471 F.3d 363, 369 (2d Cir. 2006); Fuller v. Armstrong, 204 F. App'x 987, 988 (2d Cir. 2006), cert. denied, 552 U.S. 906, 128 S. Ct. 209 (2007); Gildor v. U.S. Postal Serv., 179 F. App'x 756, 758 (2d Cir. 2006); Porter v. Coughlin, 421 F.3d 141, 144 n.2 (2d Cir. 2005); Hemphill v. New York, 380 F.3d 680, 687 (2d Cir. 2004); Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003); Johnson v. Buffalo Police Dep't, 46 F. App'x 11, 12 (2d Cir. 2002), cert. denied, 539 U.S. 959, 123 S. Ct. 2645 (2003).

[5]  See also, e.g., United States v. Acomb, No. 99-6308, 216 F.3d 1073 (table), 2000 WL 899482 at *1 (2d Cir. June 29, 2000); James v. Phillips, 05 Civ. 1539, 2008 WL 1700125 (continued...)

## II.   DEFENDANTS SHOULD BE GRANTED SUMMARY JUDGMENT ON INESTI'S "REVOLVING DOOR" CLAIM FOR POST-RELEASE MENTAL HEALTH TREATMENT

The heart of Inesti's complaint is that he was caught in a "revolving door" cycle between 2006 and 2008 where he was arrested, treated or not treated while in custody, and eventually released without a treatment plan, only to be arrested again because he was not receiving mental health treatment when not in custody.  (Dkt. No. 38: Compl. ¶¶ 72-99; see also Dkt. No. 80: Carey 12/10/12 Aff. Ex. A: Inesti Dep. at 48-49; Dkt. No. 103: Inesti Opp. Br. at ¶¶ 3, 15.)  While the City and State have a duty of responsibility for an individual while he is in their custody, that duty does not extend beyond the individual's release from custody.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  DeShaney v. Winnebago Cnty. Dep't of Social Servs., 489 U.S. 189, 199-200, 109 S. Ct. 998, 1005 (1989).[6/]  "[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar

---

[5/]   (...continued)
at *3 (S.D.N.Y. Apr. 9, 2008); Thompson v. Tracy, 00 Civ. 8360, 2008 WL 190449 at *5 (S.D.N.Y. Jan. 17, 2008); Bunting v. Nagy, 452 F. Supp. 2d 447, 454 (S.D.N.Y. 2006); Rodriguez v. McClenning, 399 F. Supp. 2d 228, 234 & n.52 (S.D.N.Y. 2005); Pack v. Artuz, 348 F. Supp. 2d 63, 78 (S.D.N.Y. 2004); Rector v. Sylvania, 285 F. Supp. 2d 349, 353 (S.D.N.Y. 2003); Walker v. Vaughan, 216 F. Supp. 2d 290, 296-97 (S.D.N.Y. 2002); Hussein v. Waldorf-Astoria, 134 F. Supp. 2d 591, 596 (S.D.N.Y. 2001) (Chin, D.J.), aff'd, 31 F. App'x 740 (2d Cir. 2002).

[6/]   Accord, e.g., Matican v. City of N.Y., 524 F.3d 151, 156 (2d Cir.), cert. denied, 555 U.S. 1047, 129 S. Ct. 636 (2008); Jacobs v. Ramirez, 400 F.3d 105, 106 (2d Cir. 2005); Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999); Brooks v. Giuliani, 84 F.3d 1454, 1466 (2d Cir.), cert. denied, 519 U.S. 992, 117 S. Ct. 480 (1996).

restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause . . . ." DeShaney v. Winnebago Cnty. Dep't of Social Servs., 489 U.S. at 200, 109 S. Ct. at 1006.[7] "[T]he State does not become the permanent guarantor of an individual's safety by having once offered him shelter." DeShaney v. Winnebago Cnty. Dep't of Social Servs., 489 U.S. at 201, 109 S. Ct. at 1006.[8]

      The City and State's duty to Inesti ended upon Inesti's discharge from custody. While this may not be sound policy, it is beyond the province of this Court to create a duty for City and State defendants to assume responsibility for Inesti's safety and general well-being after being released from custody. See, e.g., McGhie v. Main, No. 11-CV-3110, 2011 WL 4852268 at *5 (E.D.N.Y. Oct. 12, 2011) (denying deliberate indifference claim where plaintiff, who was on supervised release, "was not incarcerated or institutionalized when, as he alleges, he was deprived of necessary psychiatric care . . . [even] though the Probation Department had previously been providing him with necessary care, he was, upon the cessation of that care, free to find treatment on his own"); Cerbelli v. City of N.Y., 600 F. Supp. 2d 405, 413 (E.D.N.Y. 2009) (where psychiatric patient was released, after which he caused a disturbance at a police station resulting in his fatal shooting, the City was not liable since the N.Y.C. psychiatric facility "did not have a constitutional duty to protect him or provide him with medical services once he was no longer in its custody"); Luna v. Weiner, No. Civ.A. 05-2298, 2006 WL 1517747 at *3-4 (D.N.J. May 23, 2006) ("As a parolee, [plaintiff] had the freedom to 'exercise normal responsibility for his own welfare,' and could have secured any medical attention of his choosing. Once the plaintiff walked beyond the walls of

---

[7]    Accord, e.g., Matican v. City of N.Y., 524 F.3d at 156; Brooks v. Giuliani, 84 F.3d at 1466.

[8]    Accord, e.g., Matican v. City of N.Y., 524 F.3d at 156; Jacobs v. Ramirez, 400 F.3d at 106.

the prison in which he was being held, he regained his ability to care for himself and moved beyond the factual context for his 'cruel and unusual punishment' claims before this Court about medical care." (citation omitted)).

In any event, even if such a duty existed, which it does not, Inesti has sued individuals, and he has provided no evidence that it would have been their responsibility to arrange continuing post-release mental health care for him.  The City and State defendants should be GRANTED summary judgment on this claim.

## III.   STATUTE OF LIMITATIONS

### A.   The Statute Of Limitations For § 1983 Actions

The statute of limitations for a § 1983 action is three years.  See, e.g., Melendez v. Greiner, 477 F. App'x 801, 803 (2d Cir. 2012) ("The applicable statute of limitations for a § 1983 action arising in New York State is three years."), cert. denied, --- S. Ct. ----, 2013 WL 598715 (Feb. 19, 2013); Donaldson v. N.Y.C. Dep't of Educ., 442 F. App'x 601, 602 (2d Cir. 2011) (Plaintiff's "complaint falls well outside the three-year statute of limitations for section 1983 claims brought in New York." (citing Patterson v. Cnty. of Oneida, 375 F.3d 206, 225 (2d Cir. 2004))); Harper v. City of N.Y., 424 F. App'x 36, 39 (2d Cir. 2011) (statute of limitations for § 1983 claims is three years, which begins to run when plaintiff knows or has reason to know of the harm); Storman v. Klein, 395 F. App'x 790, 792 (2d Cir. 2010); Warren v. Altieri, 59 F. App'x 426, 427 (2d Cir. 2003) (Plaintiff's "§ 1983 action is governed by New York's three-year statute of limitations as set out in N.Y. C.P.L.R. § 214, the provision applicable to actions for personal injury.").[9/]

---

[9/]    See also, e.g., Corona Realty Holding, LLC v. Town of N. Hempstead, 382 F. App'x 70, 72 (2d Cir. 2010); Mancuso v. Hynes, 379 F. App'x 60, 61 (2d Cir. 2010); Walker v. Jastremski, (continued...)

"[F]ederal law governs the determination of the accrual date (that is, the date the statute of limitations begins to run) for purposes of the statute of limitations in a section 1983 action." Ormiston v. Nelson, 117 F.3d 69, 71 (2d Cir. 1997); accord, e.g., Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704, 710-11 (2d Cir. 2002); Eagleston v. Guido, 41 F.3d 865, 871 (2d Cir. 1994), cert. denied, 516 U.S. 808, 116 S. Ct. 53 (1995).  In general, under federal law, "the time of accrual [is] that point in time when the plaintiff knows or has reason to know of the injury which is the basis of his action." Covington v. City of N.Y., 171 F.3d 117, 121 (2d Cir.) (quotations omitted), cert. denied, 528 U.S. 946, 120 S. Ct. 363 (1999).[10]

The Court previously found that Inesti's original complaint was filed on April 7, 2011. See Inesti v. Hicks, 11 Civ. 2596, 2012 WL 2362626 at *7-8 & n.9 (S.D.N.Y. June 22, 2012) (Peck, M.J.) (citing cases), report & rec. adopted, 2012 WL 3822224 (S.D.N.Y. Sept. 4, 2012) (Crotty, D.J.).  Absent tolling, Inesti's § 1983 claims prior to April 7, 2008 would be untimely.

---

[9]    (...continued)
430 F.3d 560, 561 (2d Cir. 2005), cert. denied, 547 U.S. 1101, 127 S. Ct. 1887 (2006); Patterson v. Cnty. of Oneida, 375 F.3d at 225; Pearl v. City of Long Beach, 296 F.3d 76, 79 (2d Cir. 2002), cert. denied, 538 U.S. 922, 123 S. Ct. 1574 (2003); Paige v. Police Dep't of Schenectady, 264 F.3d 197, 199 n.2 (2d Cir. 2001); Connolly v. McCall, 254 F.3d 36, 40-41 (2d Cir. 2001); Jones v. N.Y. Dep't Corr. (DOC) Jail, 11 Civ. 4477, 2011 WL 5865143 at *2 (S.D.N.Y. Nov. 22, 2011) (Peck, M.J.), report & rec. adopted, 2012 WL 1232963 (S.D.N.Y. Apr. 12, 2012) (Crotty, D.J.); Robinson v. Fischer, 09 Civ. 8882, 2010 WL 5376204 at *5 (S.D.N.Y. Dec. 29, 2010) (Peck, M.J.); Cotto v. Pabon, 07 Civ. 7656, 2008 WL 4962986 at *5 (S.D.N.Y. Nov. 20, 2008) (Peck, M.J.); Denis v. N.Y.S. Dep't of Corr. Servs., 05 Civ. 4495, 2006 WL 217926 at *11 (S.D.N.Y. Jan. 30, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 406313 (S.D.N.Y. Feb. 22, 2006).

[10]    See also, e.g., Storman v. Klein, 395 F. App'x at 792; Assegai v. Bloomfield Bd. of Educ., 165 F. App'x 932, 934 (2d Cir. 2006); Washington v. Cnty. of Rockland, 373 F.3d 310, 317 (2d Cir. 2004); Ormiston v. Nelson, 117 F.3d at 71; Eagleston v. Guido, 41 F.3d at 871; Singleton v. City of N.Y., 632 F.2d 185, 191 (2d Cir. 1980), cert. denied, 450 U.S. 920, 101 S. Ct. 1368 (1981).

**B.**     **Statutory Tolling Of The Statute Of Limitations Under C.P.L.R. § 208**

"Although federal law determines when a section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled, unless state tolling rules would 'defeat the goals' of section 1983." Abbas v. Dixon, 480 F.3d 636, 641 (2d Cir. 2007) (quoting Pearl v. City of Long Beach, 296 F.3d 76, 80 (2d Cir. 2002), cert. denied, 538 U.S. 922, 123 S. Ct. 1574 (2003)).[11]/

New York law provides a toll for "insanity," as follows:

> If a person entitled to commence an action is under a disability because of infancy or insanity at the time the cause of action accrues, and the time otherwise limited for commencing the action is three years or more and expires no later than three years after the disability ceases, . . . the time within which the action must be commenced shall be extended to three years after the disability ceases . . . .

C.P.L.R. § 208.  This tolling provision has been held not to defeat § 1983's goals.  See Shonowsky v. City of Norwich, No. 10-CV-0745, 2011 WL 4344028 at *3 (N.D.N.Y. Apr. 18, 2011) (C.P.L.R. § 208 held not to be inconsistent with the policy underlying § 1983 in an unlawful arrest, excessive force and deprivation of due process case), report & rec. adopted, 2011 WL 4344039 (N.D.N.Y. Sept. 14, 2011); Keitt v. City of N.Y., 09 Civ. 5663, 2010 WL 3466175 at *7 (S.D.N.Y. Aug. 9, 2010), report & rec. adopted, 2010 WL 3466079 (S.D.N.Y. Sept. 2, 2010).

C.P.L.R. § 208's "toll for insanity [is] to be narrowly interpreted" to apply "to only those individuals who are unable to protect their legal rights because of an over-all inability to function in society." McCarthy v. Volkswagen of Am., Inc., 55 N.Y.2d 543, 548, 450 N.Y.S.2d 457,

---

[11]/     Accord, e.g., Melendez v. Greiner, 477 F. App'x 801, 803 (2d Cir. 2012), cert. denied, --- S. Ct. ----, 2013 WL 598715 (Feb. 19, 2013); Singleton v. City of N.Y., 632 F.2d 185, 191 (2d Cir. 1980), cert. denied, 450 U.S. 920, 101 S. Ct. 1368 (1981).

459-60 (1982).[12/]  "[T]he disability of insanity must [be] continuous during the relevant period."

Washington v. Doe, 2011 WL 679919 at *2.[13/]  "Plaintiff bears the burden of establishing the

applicability of section 208."  Shonowsky v. City of Norwich, 2011 WL 4344028 at *3.[14/]

        Because § 208 provides no definition for the term "insanity," "an individual's mental

capabilities is largely a factual question."  McCarthy v. Volkswagen of Am., Inc., 55 N.Y.2d at 548,

450 N.Y.S.2d at 459.[15/]  Under New York law, psychiatric hospitalization is not a per se basis for

a toll under § 208.  See, e.g., McAdoo v. Jagiello, No. 10-CV-355, 2011 WL 1577236 at *4

(N.D.N.Y. Apr. 26, 2011).[16/]  The "insanity [disability] need not have been adjudicated at the time

the cause of action accrued."  McCarthy v. Volkswagen of Am., Inc., 55 N.Y.2d at 547, 450

---

[12/]    Accord, e.g., Steinberg v. Proctor, Nos. 99-9332, 99-9334, 213 F.3d 626 (table), 2000 WL 687710 at *1 (2d Cir. May 25, 2000); Washington v. Doe, No. 08CV4399, 2011 WL 679919 at *2 (E.D.N.Y. Feb. 16, 2011); Estate of Mandarino v. Mandarino, 699 F. Supp. 2d 646, 654 (S.D.N.Y. 2010), aff'd, 408 F. App'x 428 (2d Cir. 2011); Swartz v. Berkshire Life Ins. Co., 99 Civ. 9462, 2000 WL 1448627 at *4 (S.D.N.Y. Sept. 28, 2000).

[13/]    Accord, e.g., Carter v. Doe, 05 Civ. 8432, 2006 WL 2109461 at *3 (S.D.N.Y. July 26, 2006); de los Santos v. Fingerson, 97 Civ. 3972, 1998 WL 740851 at *3 (S.D.N.Y. Oct. 23, 1998).

[14/]    Accord, e.g., Washington v. Doe, 2011 WL 679919 at *2; Marshall v. Downey, No. 09-CV-1764, 2010 WL 5464270 at *6 (E.D.N.Y. Dec. 27, 2010); Reyes v. City of N.Y., 00 Civ. 1050, 2000 WL 1505983 at *7 (S.D.N.Y. Oct. 6, 2000); de los Santos v. Fingerson, 1998 WL 740851 at *3; Dumas v. Agency for Child Dev.-N.Y.C. Head Start, 569 F. Supp. 831, 833-34 (S.D.N.Y. 1983); Graboi v. Kibel, 432 F. Supp. 572, 580 (S.D.N.Y. 1977); Doe v. Holy See (State of Vatican City), 17 A.D.3d 793, 794, 793 N.Y.S.2d 565, 567 (3d Dep't 2005), appeal denied, 6 N.Y.3d 707, 812 N.Y.S.2d 443 (2006).

[15/]    Accord, e.g., Matthews v. Town of Jewett, No. 09-CV-1267, 2011 WL 2973618 at *2 (N.D.N.Y. July 21, 2011); Shonowsky v. City of Norwich, No. 10-CV-745, 2010 WL 4609305 at *1 (N.D.N.Y. Nov. 4, 2010); dePoel v. City of N.Y., 772 F. Supp. 106, 108 (E.D.N.Y. 1991).

[16/]    See also, e.g., Washington v. Doe, 2011 WL 679919 at *3; Shonowsky v. City of Norwich, 2010 WL 4609305 at *1; Joseph S. v. Hogan, 561 F. Supp. 2d 280, 315 (E.D.N.Y. 2008); dePoel v. City of N.Y., 772 F. Supp. at 108 ("Mere mental illness is insufficient.").

19

N.Y.S.2d at 459.  But it must be more than mere mental illness.  E.g., Reyes v. City of N.Y., 2000 WL 1505983 at *6 ("Indeed, 'apathy, depression, post-traumatic neurosis, psychological trauma and repression therefrom or mental illness alone have been held to be insufficient' without a demonstrated inability to function."); Swartz v. Berkshire Life Ins. Co., 2000 WL 1448627 at *5 ("Difficulty in functioning is not sufficient to establish insanity for the purposes of § 208; rather, the plaintiff must be totally unable to function as a result of a 'severe and incapacitating' disability.").[17]

### C.   Application Of C.P.L.R. § 208 To Inesti

In some cases, courts conduct hearings to determine whether a plaintiff's mental state met the § 208 standard for insanity, but a hearing is not necessary here because Inesti failed to meet his burden of establishing that he suffered from "severe and incapacitating" mental illness that was continuous during the relevant period.  See, e.g., Keitt v. City of N.Y., 09 Civ. 5663, 2010 WL 3466175 at *8 (S.D.N.Y. Aug. 9, 2010) ("In this case, no evidentiary hearing is necessary for the Court to determine whether Plaintiff is entitled to tolling under Section 208, as, even assuming that all of Plaintiff's factual allegations regarding the nature of his disability are true, they would not be sufficient to demonstrate the type of 'severe and incapacitating disability' that could render him eligible for statutory tolling."), report & rec. adopted, 2010 WL 3466079 (S.D.N.Y. Sept. 2, 2010); Carter v. Doe, 05 Civ. 8432, 2006 WL 2109461 at *3 (S.D.N.Y. July 26, 2006) ("[N]o hearing is

---

[17]   See also, e.g., de los Santos v. Fingerson, 1998 WL 740851 at *4; dePoel v. City of N.Y., 772 F. Supp. at 108; Dumas v. Agency for Child Dev.-N.Y.C. Head Start, 569 F. Supp. at 833; Burgos v. City of N.Y., 294 A.D.2d 177, 178, 742 N.Y.S.2d 39, 40 (1st Dep't 2002) ("vague and conslusory" description of plaintiff's "'dementia and psychotic disorder'" is insufficient for toll); Davis v. Reed, 191 A.D.2d 348, 348, 596 N.Y.S.2d 4, 5 (1st Dep't) ("The conclusory assertion of repressed memory due to 'posttraumatic neurosis' is insufficient to invoke the tolling provisions of CPLR 208."), appeal denied, 82 N.Y.2d 749, 602 N.Y.S.2d 807 (1993).

necessary because plaintiff's litigation history and medical records clearly preclude a finding that [plaintiff's] mental illness was sufficiently severe or continuous to warrant tolling the statute of limitations under Section 208."); Swartz v. Berkshire Life Ins. Co., 99 Civ. 9462, 2000 WL 1448627 at *4 (S.D.N.Y. Sept. 28, 2000) (Plaintiff "has not produced evidence sufficient to create an issue of fact as to his insanity as of April 1991, or to warrant a hearing on the subject."); de los Santos v. Fingerson, 97 Civ. 3972, 1998 WL 740851 at *5 (S.D.N.Y. Oct. 23, 1998) ("[I]t would strain logic to require that a hearing be held where a plaintiff has not only failed to satisfy his burden of showing insanity, but has also himself submitted evidence that establishes conclusively the lack of such disability.").

Inesti asserts that he "suffers from a sever[e] mental illness and was fighting with demonic forces that hindered his role in society to be of sound mind when all the initial violations occurred" and "later when he was properly medicated and counseled by (OMH) staff plaintiff formulated his claim and submitted it." (Dkt. No. 103: Inesti Opp. Br. ¶ 24.)[18]  Inesti bears the burden of establishing that he was insane pursuant to § 208, and Inesti has failed to do so. See, e.g., Jones v. N.Y. Dep't of Corr., 11 Civ. 4477, 2011 WL 5865143 at *3 (S.D.N.Y. Nov. 22, 2011)

---

[18]    Inesti makes another argument erroneously conflating the "continuous treatment" toll with the insanity toll.  (See Inesti Opp. Br. at p. 12.)  The Court need not address this argument because the "continuous treatment" toll applies to medical malpractice claims, not § 1983 claims.  See, e.g., Cole v. Miraflor, 99 Civ. 0977, 2001 WL 138765 at *5 (S.D.N.Y. Feb. 19, 2001) (The "continuous treatment doctrine cannot apply to a § 1983 deliberate indifference claim because, first, 'courts have carefully distinguished deliberate indifference from medical malpractice,' and, second, 'the Supreme Court has stated . . . that the statute of limitations provisions of personal injury actions shall apply to all section 1983 cases.'"); West v. City of N.Y., 88 Civ. 1801, 1992 WL 249966 at *5 (S.D.N.Y. Sept. 22, 1992) ("While a medical malpractice action may share characteristics with a section 1983 action for deliberate indifference to medical needs, the continuing treatment doctrine does not apply here . . . .").  Moreover, the whole thrust of Inesti's complaint is that he was not under continuous treatment.  (See Parts II, IV, V.)

(Peck, M.J.) (Plaintiff "is not entitled to equitable tolling because he has failed to show that his mental issues prevented him from timely filing his § 1983 claim."), report & rec. adopted, 2012 WL 1232963 (S.D.N.Y. Apr. 12, 2012); Viti v. Guardian Life Ins. Co. of Am., 817 F. Supp. 2d 214, 229 (S.D.N.Y. 2011) ("'Where a plaintiff suffers from a chronic mental illness, he must show that he was actually impaired during the relevant time period.' '[C]ourts have repeatedly refused to apply equitable tolling where a plaintiff has evidenced an ability to pursue his or her legal rights during the relevant period.'" (citation omitted)); Apionishev v. Columbia Univ., 09 Civ. 6471, 2011 WL 1197637 at *4 (S.D.N.Y. Mar. 25, 2011) ("[T]he burden of demonstrating the appropriateness of equitable tolling lies with the plaintiff.  Specifically, a plaintiff must establish . . . how the particular disability 'severely impair[ed] [his] ability to comply with the filing deadline, despite [his] diligent effort to do so.'" (fn. omitted)); Rhodes v. Senkowski, 82 F. Supp. 2d 160, 169-70 (S.D.N.Y. 2000) (Plaintiff "must show that these medical problems rendered him unable to pursue his legal rights during the relevant time period.").

Inesti acknowledges that during his incarceration at MPC from September 24, 2007 to November 23, 2007, he sent one letter to Hogan and several complaints to Rabinowitz.  (See page 6 above.)  Inesti further admits that his complaints effectively got him transferred to a transitional program that he desired.  (See page 6 above.)  Inesti's admitted ability to pursue extrajudicial remedies demonstrate that he experienced lucid intervals and was able to protect his rights during the statutory period, thus further militating against the application of § 208's tolling provision.  See, e.g., Hills v. Praxair, Inc., No. 11-CV-678, 2012 WL 1935207 at *12 (W.D.N.Y. May 29, 2012) (asserting workers' compensation claim and engaging in settlement discussions evidenced plaintiff's ability to assert his legal rights); Brown v. Greene, No. 11 Civ. 4917, 2012 WL 911560 at *3

(E.D.N.Y. Mar. 16, 2012) (denying § 208 tolling where plaintiff complained to the mayor's office and other City officials, and was awarded custody of son in Family Court proceedings during the relevant period); Shonowsky v. City of Norwich, No. 10-CV-0745, 2011 WL 4344028 at *7 (N.D.N.Y. Apr. 18, 2011) (Upon "being advised of his right to consult with an attorney concerning his circumstances, [plaintiff] requested such a consultation. The record also reflects plaintiff's manifest intention from the outset to bring suit based upon the circumstances surrounding his arrest and involuntary commitment, and that to further that intention he made arrangements two days after his admission to have photographs taken of his injuries.  These actions suggest plaintiff's ability to protect his legal rights notwithstanding his mental condition and involuntary commitment and therefore militate against the applicability of section 208."), report & rec. adopted, 2011 WL 4344039 (N.D.N.Y. Sept. 14, 2011); Carter v. Doe, 2006 WL 2109461 at *3 (no tolling under § 208 where plaintiff litigated two lawsuits pro se during the relevant period); de los Santos v. Fingerson, 1998 WL 740851 at *5 (§ 208 tolling denied where plaintiff maintained psychiatric appointments and pursued rights before Worker's Compensation Board); Bedeau v. Santi, 221 A.D.2d 396, 397-98, 633 N.Y.S.2d 533, 535 (2d Dep't 1995) (denying § 208 tolling where, inter alia, plaintiff pursued a Workers' Compensation claim), appeal denied, 88 N.Y.2d 1002, 649 N.Y.S.2d 370 (1996); Cordero v. Epstein, 22 Misc. 3d 161, 166-67, 869 N.Y.S.2d 725, 729 (Sup. Ct. N.Y. Cnty. 2008) (plaintiff not insane for purposes of § 208 where she verified several complaints, executed numerous affidavits, and executed several contracts).

        While Inesti suffered from mental illness, Inesti has failed to establish that prior to April 7, 2008 he was totally unable to function as a result of a severe and incapacitating disability. Because Inesti bears the burden of establishing the applicability of § 208 and § 208's toll is to be

narrowly interpreted, Inesti was not insane within the meaning of § 208 and therefore is ineligible for § 208 tolling.  Accordingly, Inesti's claims against the City defendants arising out of his incarceration at MHAUII from November 16, 2006 to January 16, 2007 and against the State defendants arising out of his incarceration at MPC from September 24, 2007 to November 23, 2007 are time-barred and should be dismissed.

## IV.    INESTI'S CLAIMS AGAINST THE STATE DEFENDANTS[19/]

### A.    Supervisors Hogan And Rabinowitz Should Be Granted Summary Judgment For Lack Of Personal Involvement

#### 1.    Legal Standards For Personal Involvement In A § 1983 Cause Of Action

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); accord, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S. Ct. 1937, 1948 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Murphy v. Cnty. of Chemung (In re Murphy), 482 F. App'x 624, 627 (2d Cir. 2012); Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010); Warheit v. City of N.Y., 271 F. App'x 123, 126 (2d Cir. 2008); Dyno v. Vill. of Johnson City, 240 F. App'x  432, 434 (2d Cir. 2007), cert. denied, 552 U.S. 1310, 128 S. Ct. 1874 (2008).[20/]

---

[19/]    The State defendants also assert a qualified immunity defense.  (See Dkt. No. 88: State Defs. Br. at 24-25; Dkt. No. 104: State Defs. Reply Br. at 9.)  Because the Court is recommending the grant of summary judgment to the State defendants on other grounds, the Court need not address qualified immunity.

[20/]    See, e.g., Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006); Gill v. Tuttle, 93 F. App'x 301, 302 (2d Cir. 2004); Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122
(continued...)

In 1995, the Second Circuit held that:

> [t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d at 873.[21]  However, in 2009, the Supreme Court held that:

> In a § 1983 suit . . . —where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer.  Absent vicarious liability, each Government official, his or her title not withstanding, is only liable for his or her own misconduct.  In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than

---

[20]  (...continued)
(2d Cir. 2004); Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003), cert. denied, 543 U.S. 1093, 125 S. Ct. 971 (2005); Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir. 1999); Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997); Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995); Russo v. DiMilia, 07 Civ. 5795, --- F. Supp. 2d ----, 2012 WL 4108109 at *18 (S.D.N.Y. Sept. 18, 2012); Robles v. Khahaifa, No. 09CV718, 2012 WL 2401574 at *8 (W.D.N.Y. June 25, 2012); Allan v. Woods, No. 05-CV-1280, 2008 WL 724240 at *5 (N.D.N.Y. Mar. 17, 2008) ("Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability."); Tafari v. Annets, 06 Civ. 11360, 2008 WL 2413995 at *10 (S.D.N.Y. June 12, 2008) (Peck, M.J.), report & rec. adopted, 2008 WL 4449372 (S.D.N.Y. Oct. 2, 2008), aff'd, 363 F. App'x 80 (2d Cir.), cert. denied, 130 S. Ct. 3475 (2010); Zamakshari v. Dvoskin, 899 F. Supp. 1097, 1109 (S.D.N.Y. 1995) (Sotomayor, D.J. & Peck, M.J.) ("In order to maintain a cause of action [under § 1983] against any official, a plaintiff must show that the defendant was personally involved in the alleged deprivation of his constitutional rights, since the doctrine of respondeat superior does not apply to § 1983 actions.").

[21]  Accord, e.g., Ziemba v. Clark, 167 F. App'x 831, 833 (2d Cir. 2006); Samuels v. Selsky, 166 F. App'x 552, 556 (2d Cir. 2006); Patterson v. Cnty. of Oneida, 375 F.3d 206, 229 (2d Cir. 2004); Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d at 127; Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir. 2003); Hernandez v. Keane, 341 F.3d at 145; Wright v. Smith, 21 F.3d at 501; see also, e.g., Poe v. Leonard, 282 F.3d 123, 140 (2d Cir. 2002).

> knowledge is required to impose . . . liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

Ashcroft v. Iqbal, 556 U.S. at 677, 129 S. Ct. at 1949.  Although the Second Circuit has not weighed in on what remains of Colon after Iqbal, several decisions in this district have concluded that by specifically rejecting the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," id., Iqbal effectively nullified several of the classifications of supervisory liability enunciated by the Second Circuit in Colon.  See, e.g., Bellamy v. Mount Vernon Hosp., 07 Civ. 1801, 2009 WL 1835939 at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third Colon categories pass Iqbal's muster—a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred.  The other Colon categories impose the exact types of supervisory liability that Iqbal eliminated—situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate."), aff'd, 387 F. App'x 55 (2d Cir. 2010).[22]  While Colon

---

[22]     See, e.g., Doe v. New York, No. 10 CV 1792, 2012 WL 4503409 at *8 & n.3 (E.D.N.Y. Sept. 28, 2012); Vann v. Fischer, 11 Civ. 1958, 2012 WL 2384428 at *5 & n.9 (S.D.N.Y. June 21, 2012) ("In the Second Circuit, personal involvement in intentional discrimination is shown where 'the defendant participated directly in the alleged constitutional violation, [or] . . . the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom . . . .'"  "These are only the first and third scenarios listed in Colon in which personal involvement might be found, but the others have been invalidated by the Supreme Court's holding in Iqbal . . . ."); James v. Orange Cnty. Corr. Facility, 09 Civ. 7226, 2011 WL 5834855 at *4 (S.D.N.Y. Nov. 18, 2011) ("There has been considerable division among the district courts of the Second Circuit as to whether Iqbal abrogates several factors of the Colon test and if so to what extent." (citing cases)); Joseph v. Fischer, 08 Civ. 2824, 2009 WL 3321011 at *14 (S.D.N.Y. Oct. 8, 2009) ("[U]nder Iqbal, . . . [a] defendant is not liable under section 1983 if the defendant's failure to act deprived the plaintiff of his or her constitutional right."); Newton v. City of
                                                                                                    (continued...)

26

permitted supervisory liability in situations where the supervisor knew of and acquiesced in a constitutional violation committed by a subordinate, these post-Iqbal district court decisions reason that Iqbal's "active conduct" standard imposes liability only where that supervisor directly participated in the alleged violation or had a hand in creating a policy or custom under which the unconstitutional practices occurred.

These decisions may overstate Iqbal's impact on supervisory liability. Iqbal involved allegations of intentional discrimination. Ashcroft v. Iqbal, 556 U.S. at 666, 129 S. Ct. at 1942. Where the alleged constitutional violation involved "invidious discrimination in contravention of the First and Fifth Amendments," Iqbal held that "plaintiff must plead and prove that the defendant acted with discriminatory purpose," whether the defendant is a subordinate or a supervisor.  Id. at 676-77, 129 S. Ct. at 1948-49.  It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution."  Id. at 677, 129 S. Ct. at 1949.  Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth, Eighth or Fourteenth Amendments, the personal involvement analysis set forth in Colon may still apply.[23]

_____

[22]     (...continued)
N.Y., 640 F. Supp. 2d 426, 448 (S.D.N.Y. 2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in Ashcroft v. Iqbal.").

[23]     See, e.g., Smolen v. Fischer, 12 Civ. 1856, 2012 WL 5928282 at *5 (S.D.N.Y. Nov. 27, 2012) (Peck, M.J.); Alli v. City of N.Y., 11 Civ. 7665, 2012 WL 4887745 at *6 (S.D.N.Y. Oct. 12, 2012) ("[W]here the claim does not require a showing of discriminatory intent, the
(continued...)

27

2.      **Application Of The Personal Involvement Standard To State Supervisory Defendants Hogan And Rabinowitz**

a.      **OMH Commissioner Hogan**

Even if Inesti's claims against Hogan are not dismissed as time barred, they still should be dismissed for lack of personal involvement.  During Inesti's incarceration at MPC from September 24, 2007 to November 23, 2007, Inesti sent one letter to Hogan, in which he complained that MPC nurses were injecting him with psychotropic medication without his consent.  (See page 6 above.)  Inesti never received a response from Commissioner Hogan, and OMH has no record of Inesti's letter to Commissioner Hogan.  (See page 6 above.)  During his incarceration at Kirby from November 2008 to January 2009, Inesti did not complain to Hogan.  (See page 8 above.)

Even assuming that all of the Colon factors survived Iqbal, Inesti's one complaint letter to Hogan is insufficient to establish personal involvement.  See, e.g., Goris v. Breslin, 402 F. App'x 582, 584 (2d Cir. 2010) (affirming dismissal of case where personal involvement "was limited to the receipt of two letters from [plaintiff], which [defendant] promptly referred to other individuals for investigation and response"); Rivera v. Bloomberg, 11 Civ. 629, 11 Civ. 4325, 2012 WL

---

23/      (...continued)
personal-involvement analysis set forth in Colon should still apply."); Inesti v. Hicks, 11 Civ. 2596, 2012 WL 2362626 at *11 (S.D.N.Y. June 22, 2012) (Peck, M.J.), report & rec. adopted, 2012 WL 3822224 (S.D.N.Y. Sept. 4, 2012) (Crotty, D.J.); Hodge v. Sidorowicz, 10 Civ. 428, 2011 WL 6778524 at *16 (S.D.N.Y. Dec. 20, 2011), report & rec. adopted, 2012 WL 701150 (S.D.N.Y. Mar. 6, 2012) (Crotty, D.J.); Sash v. United States, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009) (Peck, M.J.); see also, e.g., Chao v. Ballista, 630 F. Supp. 2d 170, 178 n.2 (D. Mass. July 1, 2009) (noting that the "state of mind required to make out a supervisory claim under the Eighth Amendment—i.e., deliberate indifference—requires less than the discriminatory purpose or intent that Iqbal was required to allege in his suit . . . ."); Michael Avery et al., Police Misconduct: Law & Litigation § 4:5 (2009) (discussing the impact of Iqbal on supervisor liability in § 1983 and Bivens actions); cf. Caiozzo v. Koreman, 581 F.3d 63, 66 (2d Cir. 2009) (the standard is the same for Eighth Amendment and Fourteenth Amendment deliberate indifference claims).

3655830 at *10 (S.D.N.Y. Aug. 27, 2012) ("Assuming arguendo that Commissioner . . . received Plaintiffs' complaints and failed to act on them, this is not sufficient to establish supervisory liability. Were it otherwise, virtually every prison inmate who sues for constitutional torts by [prison officials] could name the [supervisor] as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the [supervisor]." (quotations omitted)); Soto v. Wright, 11 Civ. 2289, 2012 WL 639166 at *2 (S.D.N.Y. Feb. 28, 2012) (Crotty, D.J.) (no personal involvement where deputy commissioner and chief medical officer received one letter from plaintiff and asked someone else to respond); Koehl v. Bernstein, 10 Civ. 3808, 2011 WL 2436817 at *16 (S.D.N.Y. June 17, 2011) (no personal involvement where superintendent merely disregarded plaintiff's complaints), report & rec. adopted, 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011); Gonzales v. Wright, No. 06-CV-1424, 2010 WL 681323 at *10 (N.D.N.Y. Feb. 23, 2010) (The "mere receipt of letters from an inmate by a facility Superintendent regarding a medical claim is insufficient to constitute personal liability.").[24]

       Accordingly, the State defendants' summary judgment motion should be GRANTED as to Inesti's claims against Hogan.

---

[24]    See also, e.g., Applegate v. Annuci, No. 02-CV-0276, 2008 WL 2725087 at *18 (N.D.N.Y. July 10, 2008) ("the mere writing of the letter to a superintendent, without response, is an insufficient basis to find personal involvement on the part of the Superintendent"); Woods v. Goord, 97 Civ. 5143, 1998 WL 740782 at *6 (S.D.N.Y. Oct. 23, 1998) ("Receiving letters or complaints . . . does not render [prison superintendent] personally liable under § 1983."); Watson v. McGinnis, 964 F. Supp. 127, 130 (S.D.N.Y. 1997) (Kaplan, D.J. & Peck, M.J.) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."); Greenwaldt v. Coughlin, 93 Civ. 6551, 1995 WL 232736 at *4 (S.D.N.Y. Apr. 19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.").

### b.  Rabinowitz

Inesti asserts that Rabinowitz is personally involved because Inesti complained to Rabinowitz.  (Dkt. No. 103: Inesti Opp. Br. ¶ 19.)  While at Kirby, Inesti wrote one or two letters to Rabinowitz but never spoke with Rabinowitz regarding his treatment.  (See page 8 above.)  Inesti argues that "[i]f no action is taken and the complaints are simply ignored or not filed then a personal involvement is being acted out by these authorit[ie]s in position to investigate and rectify matters." (Inesti Opp. Br. ¶ 19.)  Case law does not support Inesti's argument.  To the contrary, as discussed in relation to Commissioner Hogan's personal involvement, a few complaints alone are insufficient to establish personal involvement.  (See cases cited on pages 27-28 above.)

Inesti also has failed to establish Rabinowitz's personal involvement in relation to his First Amendment retaliatory transfer claim.  Inesti was admitted to Kirby pursuant to a C.P.L. Article 730 Order on November 26, 2008 after being indicted and found unfit for trial.  (See page 5 above.)  On January 5, 2009, Kirby forensic psychiatrists determined that Inesti was competent to stand trial.  (See page 8 above.)  "[W]hen clinical staff [find] a patient referred pursuant to CPL 730 to be fit," the Executive Director (Rabinowitz) normally would "certify that defendants were no longer incapacitated and were capable of understanding the proceedings against him."  (Dkt. No. 90: Rabinowtiz Aff. ¶ 9.)  Rabinowitz normally "would sign a 'Notification of Fitness to Proceed' based on the competency report of the defendant's treatment team at Kirby."  (Rabinowtiz Aff. ¶ 9.) In Inesti's case, however, Deputy Director Vinny Miccoli "signed the 'Notification of Fitness to Proceed'" based on the competency report of Kirby's forensic psychiatrists.  (Rabinowtiz Aff. ¶ 10 & Ex. A: Notification of Fitness to Proceed.)  Thus, Miccoli, not Rabinowitz, certified that Inesti was no longer incapacitated and was capable of understanding the proceedings against him.

Because the record fails to support Inesti's claim that Rabinowitz was personally involved in the transfer decision, the Court should find that Rabinowitz was not personally involved. See, e.g., Gonzales v. Carpenter, No. 08-CV-629, 2011 WL 768990 at *5 (N.D.N.Y. Jan. 3, 2011) ("Plaintiff alleges nothing to support a plausible inference that a correctional sergeant, with no connection to the DOCS or OMH medical staff, could have caused the inmate's transfer for a mental health evaluation, even if [sergeant] knew of plaintiff's various prior lawsuits and was inclined to retaliate against him . . ." (fn. omitted)), report & rec. adopted, 2011 WL 767546 (N.D.N.Y. Feb. 25, 2011); McQuilkin v. Cent. N.Y. Psychiatric Ctr., No. 08-CV-975, 2010 WL 3765847 at *15 (N.D.N.Y. Aug. 27, 2010) (plaintiff's claim that the prison superintendent transferred him in retaliation fails because "the record reflects the decision was made by OMH care providers following an evaluation of plaintiff's mental status," not by the superintendent), report & rec. adopted, 2010 WL 3765715 (N.D.N.Y. Sept. 20, 2010); Rivera v. Pataki, 04 Civ. 1286, 2005 WL 407710 at *23 (S.D.N.Y. Feb. 7, 2005) ("Plaintiff's remaining claims against [defendant] for retaliatory transfer . . . , have no basis in the record and plaintiff has not alleged any specific personal involvement justifying [defendant's] supervisory liability. All claims as to defendant . . . therefore are dismissed." (citation omitted)); Lipton v. Cnty. of Orange, 315 F. Supp. 2d 434, 459 (S.D.N.Y. 2004) (no personal involvement by prison administrator or supervisor for alleged retaliatory transfer of pretrial detainee where neither participated in actual transfer and did not learn of the transfer until after it was accomplished).[25/]

---

[25/]   See also, e.g., Walker v. Pataro, 99 Civ. 4607, 2002 WL 664040 at *15 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.) (no personal involvement where plaintiff "has not submitted any evidence to contradict [defendant's] claim that he was not involved in [plaintiff's] transfer"); Jackson v. Johnson, 15 F. Supp. 2d 341, 365-66 (S.D.N.Y. 1998) (Kaplan, D.J. & Peck, M.J.)
(continued...)

Accordingly, the State defendants' summary judgment motion should be <u>GRANTED</u> as to Inesti's claims against Rabinowitz.

**B.      Dr. Tuzel's Summary Judgment Motion Should Be Granted**

Inesti alleges that Dr. Tuzel was deliberately indifferent to Inesti's mental health needs and also that Dr. Tuzel injected him with psychotropic medication without Inesti's consent while Inesti was physically restrained.  (Dkt. No. 38: Compl. ¶¶ 134, 136, 140; Dkt. No. 103: Inesti Opp. Br. ¶¶ 3, 6-7, 15, 21.)  Because Inesti was a pretrial detainee, his claim is analyzed under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment.  <u>See</u>, <u>e.g.</u>, <u>Inesti</u> v. <u>Hicks</u>, 11 Civ. 2596, 2012 WL 2362626 at *12 & n.21 (S.D.N.Y. June 22, 2012) (Peck, M.J.) (citing cases), <u>report & rec. adopted</u>, 2012 WL 3822224 (S.D.N.Y. Sept. 4, 2012) (Crotty, D.J.).

**1.      Legal Standards For Inesti's Deliberate Indifference Claim Against Dr. Tuzel**

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. <u>See</u> 42 U.S.C. § 1983; <u>West</u> v. <u>Atkins</u>, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55 (1988).  "Section

---

[25/]     (...continued)
(dismissing plaintiff's retaliatory transfer claim because plaintiff did not show that defendant correction officer or commissioner were personally involved in the transfer decision); <u>McFarlan</u> v. <u>Coughlin</u>, No. 97-CV-740, 1998 WL 185571 at *2 (N.D.N.Y. Apr. 15, 1998) ("Plaintiff submitted extensive documentation in support of his position [as to the retaliatory transfer], but none of the documentation indicated the involvement of any of these defendants."); <u>Burke</u> v. <u>McCoy</u>, No. 96-CV-0984, 1997 WL 610650 at *4 (N.D.N.Y. Oct. 1, 1997) (Pooler, D.J.) ("This evidence is insufficient to create an issue of fact as to [superintendent's] personal involvement in the transfer.  [Plaintiff] does not controvert [defendant's] assertion that the transfer decision was made by DOCS in Albany and that [defendant] was not involved in [plaintiff's] transfer."), <u>aff'd</u>, No. 97-2780, 165 F.3d 13 (table), 1998 WL 801951 (2d Cir. Nov. 12, 1998).

1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."  Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted), cert. denied, 512 U.S. 1240, 114 S. Ct. 2749 (1994).

The Second Circuit has held that:

> while the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner. . . .  Thus, the official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need.

Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996).[26/]  The standard for such a claim is the same as one brought by a convicted prisoner under the Eighth Amendment.  Caiozzo v. Koreman, 581 F.3d at 72.

As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a subjective prong."  Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).[27/]  "Objectively, the alleged deprivation must be 'sufficiently serious' . . . ." Id. at 553; Smith v. Carpenter, 316 F.3d at 183-84 ("The objective 'medical need' element measures the severity of

---

[26/]    See also, e.g., Cnty. of Sacramento v. Lewis, 523 U.S. 833, 849-50, 118 S. Ct. 1708, 1718 (1998); Caiozzo v. Koreman, 581 F.3d 63, 70-72 (2d Cir. 2009); Grant v. N.Y.C. Dep't of Corr., No. 96-2469, 104 F.3d 355 (table), 1996 WL 734052 at *1 (2d Cir. Dec. 23, 1996); Wicks v. Qualtere, Nos. 95-CV-425, 95-CV-426, 1997 WL 176338 at *3 (N.D.N.Y. Apr. 4, 1997) (Pooler, D.J.); Landy v. Irizarry, 884 F. Supp. 788, 801 n.20 (S.D.N.Y. 1995).

[27/]    Accord, e.g., Fransua v. Vadlamudi, No. 05-1715, 2008 WL 4810066 at *1 (2d Cir. Nov. 3, 2008); Salahuddin v. Goord, 467 F.3d 263, 279-81 (2d Cir. 2006); Smith v. Carpenter, 316 F.3d 178, 183-84 (2d Cir. 2003); Selby v. Coombe, 17 F. App'x. 36, 37 (2d Cir. 2001); Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).

the alleged deprivation . . . .").[28/]   "'The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves  . . . .'"  Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986).  "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth [or Fourteenth] Amendment violation."  Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 2324 (1991) (citation omitted); see also, e.g., Dean v. Coughlin, 804 F.2d at 215 ("'[T]he essential test is one of medical necessity and not one simply of desirability.'").  Thus, the constitutional protection is limited to "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'"  Chance v. Armstrong, 143 F.3d at 702;[29/] accord, e.g., Fransua v. Vadlamudi, 2008 WL 4810066 at *1; Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'").

The Second Circuit has stated that determining whether a deprivation is objectively serious entails two inquiries:

> Determining whether a deprivation is an objectively serious deprivation entails two inquiries.  The first inquiry is whether the prisoner was actually deprived of adequate medical care.  As the Supreme Court has noted, the prison official's duty is only to provide reasonable care.  Thus, "prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable . . ." and, conversely, failing "to take reasonable measures" in response to a medical condition can lead to liability.

[28/]   See also, e.g., Fransua v. Vadlamudi, 2008 WL 4810066 at *1; Salahuddin v. Goord, 467 F.3d at 279-81; Selby v. Coombe, 17 F. App'x. at 37; Chance v. Armstrong, 143 F.3d at 702.

[29/]   The Second Circuit in Chance v. Armstrong identified several factors that are relevant in determining whether a serious medical condition exists, including "'[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" 143 F.3d at 702.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious.  This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.  For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious.  Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain."  In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower.  For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry "focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone."  Thus, although we sometimes speak of a "serious medical condition" as the basis for [such a] claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

Salahuddin v. Goord, 467 F.3d at 279-80 (citations omitted, emphasis added).

"'Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a serious medical need . . . .'" Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000); see, e.g., Hamm v. Hatcher, 05 Civ. 503, 2013 WL 71770 at *8 (S.D.N.Y. Jan. 7, 2013); Hale v. Rao, 768 F. Supp. 2d 367, 378 (N.D.N.Y. 2011) ("Mental illness can constitute a serious medical need." (citing Langley v. Coughlin, 888 F.2d 252, 254 (2d Cir. 1989)); Covington v. Westchester Cnty. Dep't of Corr., 06 Civ. 5369, 2010 WL 572125 at *6 (S.D.N.Y. Jan. 25, 2010).

Where the plaintiff alleges delay or interruption in treatment rather than failure to receive treatment, "the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner." Smith v. Carpenter, 316 F.3d at 186.  "[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [these] purposes." Id. (citing Chance v. Armstrong, 143 F.3d at 702-03).  "The absence of

adverse medical effects or demonstrable physical injury is one . . . factor that may be used to gauge the severity of the medical need at issue.  Indeed, in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."  Id. at 187 (citations omitted).

"Subjectively, the charged official must act with a sufficiently culpable state of mind." Hathaway v. Coughlin, 99 F.3d at 553; accord, e.g., Fransua v. Vadlamudi, 2008 WL 4810066 at *1; Salahuddin v. Goord, 467 F.3d at 280-81; Smith v. Carpenter, 316 F.3d at 184 ("[T]he subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."); Selby v. Coombe, 17 F. App'x. at 37; Chance v. Armstrong, 143 F.3d at 702.  "The required state of mind, equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998) (quotations omitted, quoting Hathaway v. Coughlin, 99 F.3d at 553 (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994))); see, e.g., Caiozzo v. Koreman, 581 F.3d at 71 (to establish a violation of his Fourteenth Amendment due process rights, a plaintiff "must prove, inter alia, that the government-employed defendant disregarded a risk of harm to the plaintiff of which the defendant was aware").[30/]

---

[30/]   See also, e.g., Sinkov v. Americor, Inc., 419 F. App'x 86, 89 (2d Cir. 2011) ("evidence 'that [a defendant] should have been aware that [the detainee] was in immediate danger' was insufficient"); Mayo v. Cnty. of Albany, 357 F. App'x 339, 341 (2d Cir. 2009) ("A plaintiff bringing a deliberate indifference claim must therefore demonstrate that the defendant
(continued...)

Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison [officials or] guards in intentionally denying or delaying access to medical care." Estelle v. Gamble, 429 U.S. 97, 104-05, 97 S. Ct. 285, 291 (1976) (fn. omitted). However, an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." 429 U.S. at 105-06, 97 S. Ct. at 292; accord, e.g., Burton v. N.Y.S. Dep't of Corr., 93 Civ. 6028, 1994 WL 97164 at *2 (S.D.N.Y. Mar. 21, 1994) (Sotomayor, D.J.).   "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . ." Estelle v. Gamble, 429 U.S. at 106, 97 S. Ct. at 292.[31]  As the Supreme Court has stated, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Id.; accord, e.g., Smith v. Carpenter, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."); Hathaway v. Coughlin, 99 F.3d at 553; Burton v. N.Y.S. Dep't of Corr., 1994 WL 97164 at *2.

---

[30]   (...continued)
deliberately disregarded knowledge of the harm he knew he could cause as a result of his actions."); Ross v. Westchester Cnty. Jail, 10 Civ. 3937, 2012 WL 86467 at *5 (S.D.N.Y. Jan. 11, 2012) ("Deliberate indifference is a mental state akin to 'recklessness,' and is measured using a 'subjective test' that discerns whether the defendant was 'actually aware of an excessive risk to an inmate's health or safety,' and therefore 'act[ed] with a sufficiently culpable state of mind.'" (citation omitted)); Mercado v. City of N.Y., 08 Civ. 2855, 2011 WL 6057839 at *4 (S.D.N.Y. Dec. 5, 2011).

[31]   Accord, e.g., Salahuddin v. Goord, 467 F.3d at 280; Hathaway v. Coughlin, 99 F.3d at 553; Felipe v. N.Y.S. Dep't of Corr. Servs., No. 95-CV-1735, 1998 WL 178803 at *3 (N.D.N.Y. Apr. 10, 1998) (Pooler, D.J.).

> ### 2.  Application Of The Legal Standards To Inesti's Deliberate Indifference Claim

Inesti alleges that Dr. Tuzel was deliberately indifferent to his need for proper mental health treatment.  (Dkt. No. 103: Inesti Opp. Br. ¶¶ 6-7, 15, 21.)  Inesti cites McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), for the proposition that a serious medical need may exist where "a medical condition . . . significantly affects an individual's daily activities" and  asserts that his "medical condition p[e]rtaining to his mental illness has had serious consequences for him that at times he is unable to work, sleep, read, write or participate in every day normal activities." (Inesti Opp. Br. ¶ 6.)  Inesti also asserts that Dr. Tuzel "abrupt[]ly stopped plaintiff[']s medication causing plaintiff sever[e] mental distress and pain" and falsely diagnosed Inesti of malingering, which ultimately led to him being found fit for trial, convicted, and sentenced to twenty years to life. (Inesti Opp. Br. at ¶¶ 6, 7, 15, 21.)  Inesti also seems to argue that because Dr. Tuzel later prescribed medication to Inesti, Dr. Tuzel was deliberately indifferent for discontinuing Inesti's medication in the first place.  (Inesti Opp. Br. ¶¶ 7, 21 & Ex. E: Inesti 4/9/09 Prescription.)

Inesti's medical records establish that Inesti received treatment at Kirby.  (See generally Dkt. No. 91: Buskin Aff. Ex. D: Inesti Med. Records.)  Inesti admits attending beneficial therapy groups directed by Dr. Tuzel.  (Dkt. No. 88: State Defs. Br. at 20-21; Buskin Aff. Ex. A: Inesti Dep. at 138-39.)   On January 12, 2009, Inesti consented to and received intramuscular medication.  (See page 8 above.)  Inesti also had a standing order for pshychotropic medication, and although the standing order was discontinued by January 14, 2009, Inesti continued to request and receive Risperidone.  (See page 8 above.)

Inesti appears to disagree with the treatment offered and received, but he fails to provide any evidence that his mental health treatment or lack thereof while at Kirby resulted in an urgent threat to his health or was otherwise so grossly inadequate to rise to the level of deliberate indifference.  See, e.g., Bellotto v. Cnty. of Orange, 248 F. App'x 232, 237 (2d Cir. 2007) (Plaintiff's "treatment, which allegedly included missed medication dosages and inadequate monitoring of medications, also could not be found to rise to the level of a constitutional violation because the risk of harm that [appellant] faced as a result of the alleged treatment was not substantial. . . . [T]he only medical consequence he alleges was an anxiety attack, which . . . resulted in no physical injuries and 'no acute distress.'"); Hamm v. Hatcher, 05 Civ. 503, 2013 WL 71770 at *9 (S.D.N.Y. Jan. 7, 2013) (ten-day interruption in medication resulting in withdrawal symptoms, including "exacerbated depression, nightmares, hopelessness, and suicidal thoughts" was insufficient to establish significant risk of serious harm); Mastroianni v. Reilly, 602 F. Supp. 2d 425, 434 (E.D.N.Y. 2009) (granting summary judgment for psychiatry department where medications were changed and discontinued but later reinstated because psychiatry department's actions "did not pose any particular risk of harm or result in actual adverse consequences to the plaintiff"); Goodson v. Evans, 438 F. Supp. 2d 199, 202 (W.D.N.Y. 2006) (granting summary judgment for defendants where plaintiff's course of treatment was changed but there was "no evidence, however, that those changes were incorrect or medically inappropriate"); Atkins v. Cnty. of Orange, 372 F. Supp. 2d 377, 409-11 (S.D.N.Y. 2005) (granting summary judgment where plaintiffs' broad allegations—"'over-medication with psychotropic drugs; denial of timely psychiatric evaluations; denial of emergency psychiatric care; denial of timely prescription drug administration; denial of adequate staffing of observation holding cells; denial of adequate therapeutic psychiatric care; and, denial of discharge planning and

treatment plans'"—did not rise to a level of constitutional deprivation), <u>aff'd on other grounds</u>, 248 F. App'x 232 (2d Cir. 2007);  <u>Beckford</u> v. <u>Portuondo</u>, 151 F. Supp. 2d 204, 218 (N.D.N.Y. 2001) (Even "accepting that Plaintiff's mental health care was far from optimum, he was provided significant psychotropic medication, bi-weekly individual therapy sessions, and monthly medical reviews . . . .  At most, Plaintiff disagrees with the treatment offered and alleges that he should have received more time with a psychiatrist, additional group therapy treatment, access to the facility's Intermediate Core Program, and increased out of cell and outdoor activity.  Nowhere does Plaintiff allege that the failure to provide him these additional treatments resulted in an urgent threat to his life or limb or was otherwise so grossly inadequate to rise to the level of deliberate indifference.").[32]

Because Inesti's claims do not satisfy the objective prong for deliberate indifference, there is no need to discuss whether Inesti's claims fulfill the subjective requirement.  <u>See</u>, <u>e.g.</u>, <u>Goris</u> v. <u>Breslin</u>, 402 F. App'x 582, 584 (2d Cir. 2010) (Court need not reach subjective prong where plaintiff failed to satisfy the objective prong); <u>Smolen</u> v. <u>Fischer</u>, 12 Civ. 1856, 2012 WL 3609089 at *12 n.22 (S.D.N.Y. Aug. 23, 2012) (Peck, M.J.).

Accordingly, State defendants summary judgment motion as to Inesti's deliberate indifference claims against Dr. Tuzel should be <u>GRANTED</u>.

---

[32]   <u>See also</u>, <u>e.g.</u>, <u>Hanrahan</u> v. <u>Menon</u>, No. 07-CV-610, 2010 WL 6427650 at *10 (N.D.N.Y. Dec. 15, 2010) ("The conclusion of the mental health staff . . . that plaintiff's primary health issue was substance abuse, and that he was not suffering from a major mental illness that required medication, clearly did not reflect deliberate indifference to a serious medical need."), <u>report & rec. adopted</u>, 2011 WL 1213171 (N.D.N.Y. Mar. 31, 2011), <u>aff'd</u>, 470 F. App'x 32 (2d Cir. 2012); <u>Sonds</u> v. <u>St. Barnabas Hosp. Corr. Health Servs.</u>, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) (Disagreements "over medications, diagnostic techniques . . . , forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim.").

### 3. Inesti's Forced Medication Claim Against Dr. Tuzel

Psychiatric patients have a "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." Washington v. Harper, 494 U.S. 210, 221-22, 110 S. Ct. 1028, 1036 (1990); see, e.g., Kulak v. City of N.Y., 88 F.3d 63, 74 (2d Cir. 1996) ("It is a firmly established principle of the common law of New York that every individual of adult years and sound mind has a right to determine what shall be done with his own body and to control the course of his medical treatment." (quotations omitted)).[33]

However, "it is well-settled that a patient's liberty interest in not being involuntarily medicated is overridden in an emergency, where failure to medicate forcibly would result in a substantial likelihood of physical harm to that patient, other patients, or to staff members of the institution." Odom v. Bellevue Hosp. Ctr., 93 Civ. 2794, 1994 WL 323666 at *3 (S.D.N.Y. July 5, 1994); see, e.g., Kulak v. City of N.Y., 88 F.3d at 74 ("Such a right may be set aside only in narrow circumstances, including those where the patient 'presents a danger to himself or other members of society or engages in dangerous or potentially destructive conduct within the institution.'").[34]

---

[33]   See also, e.g., Meyers v. N.Y. Att'y Gen., No. 12-CV-4450, 2013 WL 244934 at *6 (E.D.N.Y. Jan. 17, 2013); United States v. Hardy, 878 F. Supp. 2d 373, 381 (E.D.N.Y. 2012); Muhammad v. Rabinowitz, 11 Civ. 2428, 2012 WL 1155098 at *4 (S.D.N.Y. Apr. 6, 2012); Coleman v. State Sup. Ct., 697 F. Supp. 2d 493, 506 (S.D.N.Y. 2010); Fisk v. Letterman, 501 F. Supp. 2d 505, 524 (S.D.N.Y. 2007).

[34]   See also, e.g., Meyers v. N.Y. Att'y Gen., 2013 WL 244934 at *6; Murray v. Melendz, Civ. No. 03-CV-1263, 2011 WL 4595213 at *5 (N.D.N.Y. Sept. 13, 2011), report & rec. adopted, 2011 WL 4595209 (N.D.N.Y. Sept. 30, 2011); Jelich v. Hogan, No. 09 Civ. 3278, 2009 WL 3497495 at *3 (E.D.N.Y. Oct. 27, 2009).

A "decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Youngberg v. Romeo, 457 U.S. 307, 323, 102 S. Ct. 2452, 2462 (1982) (fn. omitted); see, e.g., Kulak v. City of N.Y., 88 F.3d at 75 (A "doctor will not be liable under § 1983 for the treatment decisions she makes unless such decisions are 'such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.'"); Vanbrocklen v. Gupta, No. 09-CV-897, 2010 WL 5575325 at *5 (W.D.N.Y. Nov. 23, 2010); McNair v. Kirby Forensic Psychiatric Ctr., 09 Civ. 6660, 2010 WL 4446772 at *9 (S.D.N.Y. Nov. 5, 2010). "This standard requires more than simple negligence on the part of the doctor but less than deliberate indifference." Kulak v. City of N.Y., 88 F.3d at 75; see, e.g., Britt v. Buffalo Mun. Hous. Auth., 827 F. Supp. 2d 198, 208 (W.D.N.Y. 2011); Vanbrocklen v. Gupta, 2010 WL 5575325 at *5.

Inesti alleges that Dr. Tuzel injected him with psychotropic medication without his consent while he was physically restrained.  (Dkt. No. 103: Inesti Opp. Br. ¶¶ 3, 7.)  While Inesti received intramuscular medication without his consent on three occasions, Dr. Tuzel was involved in only one administration.  (See page 7 above.)  On December 26, 2008, Inesti complained that he was feeling "'anxious,' 'nervous,' and 'irritable,'" and at 11:30 a.m., Inesti became "'irritable,' 'loud,' and 'angry'" and requested a second dose of medication.  (See page 7 above.)  While yelling and screaming in Dr. Tuzel's office, Inesti was offered and refused intramuscular medication.  (See page 7 above.)  Concluding that Inesti's hostile and violent behavior presented a danger to himself and others, Dr. Tuzel ordered that Inesti be give Lorazepam for anxiety, Haloperidone for schizophrenia

symptoms and Diphenhydramine, a sleep aid.  (See page 7 above.)  While Inesti does not recall if

he was violent on December 26, 2009, Inesti concedes that he was not "'stable.'"  (See page 7 above.)

Inesti also admits that he can become violent when he does not take his medication.  (See page 7

above.)  Inesti also conceded that the injections stabilized and calmed him.  (See page 7 above.)

    The record establishes that Dr. Tuzel decided to medicate Inesti without his consent

on December 26, 2008 because Inesti was a danger to himself and others.  See, e.g., Anthony v. City

of N.Y., 339 F.3d 129, 142 (2d Cir. 2003) (Sotomayor, C.J.) (involuntary medication did not violate

due process rights where staff reasonably believed that plaintiff was a danger to herself or others);

Kulak v. City of N.Y., 88 F.3d at 74 (granting summary judgment to a prison doctor who forcibly

administered Haldol to an inmate who was "'extremely angry,'" had extensive history of mental

illness, and was considered "'imminently likely to engage in conduct posing a risk of physical harm

to himself or others'"); Murray v. Melendz, 2011 WL 4595213 at *6 (granting summary judgment

for doctor who injected plaintiff without his consent to calm him down and ensure his safety and the

safety of prison staff); Lombardo v. Stone, 99 Civ. 4603, 2001 WL 940559 at *10 (S.D.N.Y. Aug.

20, 2001) (granting summary judgment for defendants where defendants assert "plaintiff was

assaultive and dangerous throughout this period and that medication was therefore necessary to

protect his safety and the safety of others" and finding plaintiff's "conclusory allegations of a

purported conspiracy by defendants do not raise a triable issue of fact").

    Moreover, Dr. Tuzel's decision is presumptively valid, and Inesti has failed to

establish that Dr. Tuzel's decision was a "substantial departure from accepted professional judgment,

practice, or standards as to demonstrate that the person responsible actually did not base the decision

on such a judgment."  See, e.g., Kraft v. City of N.Y., 696 F. Supp. 2d 403, 415 (S.D.N.Y. 2010)

("Because plaintiff fails to offer any evidence that the doctor defendants' diagnoses, actions, and subsequent determinations . . . fell substantially below accepted medical standards, no reasonable jury could conclude that they violated plaintiff's substantive due process rights under the Fourteenth Amendment."), aff'd, 441 F. App'x 24 (2d Cir. 2011); Capellupo v. Nassau Health Care Corp., No. 06-CV-4922, 2009 WL 1705749 at *12 (E.D.N.Y. June 16, 2009) ("[T]he Court finds that plaintiff has failed to raise any genuine issues of material fact regarding defendants' comportment with the generally accepted standards of medical care and, by extension, their compliance with the requirements of the Mental Hygiene Law."); Fisk v. Letterman, 501 F. Supp. 2d at 524 (granting summary judgment where plaintiff "has offered no evidence to support a claim that the defendants' decision to medicate her against her will deviated from accepted medical standards").

Accordingly, the State defendants' summary judgment motion should be GRANTED as to Inesti's forcible medication claim against Dr. Tuzel.

## V.   CITY DEFENDANTS' SUMMARY JUDGMENT MOTION SHOULD BE GRANTED[35/]

### A.   Conditions Of Confinement

#### 1.   Legal Standard As To Conditions Of Confinement Of Pretrial Detainees

The Supreme Court has held that because:

---

[35/]   The City defendants also assert that Inesti failed to administratively exhaust his grievances as required by the Prison Litigation Reform Act ("PLRA").   (See Dkt. No. 85: City Defs. Br. at 7-12; Dkt. No. 105: City Defs. Reply Br. at 3-4.)   Since the Court is recommending the denial of Inesti's claims on the merits, it need not address whether Inesti complied with the PLRA.   See, e.g., Roseboro v. Gillespie, 791 F. Supp. 2d 353, 359 n.5 (S.D.N.Y. 2011) (Peck, M.J.) ("Since this Court is denying [plaintiff's] claims on the merits, it need not address whether [plaintiff] complied with the PLRA."); Henderson v. Sommer, 08 Civ. 3440, 09 Civ. 611, 2011 WL 1346818 at *5 n.3 (S.D.N.Y. Apr. 1, 2011) (addressing PLRA: "The Court 'need not specifically decide whether [Plaintiff's claims have] been exhausted because [such] claims fail on the merits.'").

> [a] person lawfully committed to pretrial detention has not been adjudged guilty of
> any crime[,] . . . the Government . . . may detain him to ensure his presence at trial
> and may subject him to the restrictions and conditions of the detention facility so
> long as those conditions and restrictions do not amount to punishment, or otherwise
> violate the Constitution.

Bell v. Wolfish, 441 U.S. 520, 536-37, 99 S. Ct. 1861, 1872-73 (1979); see, e.g., Sandin v. Conner,

515 U.S. 472, 484, 115 S. Ct. 2293, 2300 (1995); Schall v. Martin, 467 U.S. 253, 269, 104 S. Ct.

2403, 2412 (1984); Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009) (pretrial detainees are

protected by the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment,

because pretrial detainees cannot be punished); Benjamin v. Fraser, 264 F.3d 175, 188 (2d Cir.

2001).[36]

> Not every disability imposed during pretrial detention amounts to
> "punishment" in the constitutional sense . . . .  And the fact that such detention
> interferes with the detainee's understandable desire to live as comfortably as possible
> and with as little restraint as possible during confinement does not convert the
> conditions or restrictions of detention into "punishment."

Bell v. Wolfish, 441 U.S. at 537, 99 S. Ct. at 1873.

> In regard to the demonstration of punishment,

> [a]bsent a showing of an expressed intent to punish, the determination whether a
> condition is imposed for a legitimate purpose or for the purpose of punishment
> "generally will turn on whether an alternative purpose to which [the restriction] may
> rationally be connected is assignable for it, and whether it appears excessive in
> relation to the alternative purpose assigned [to it]."

Benjamin v. Fraser, 264 F.3d at 188 (quoting Bell v. Wolfish, 441 U.S. at 538, 995 S. Ct. at 1874)

(alteration in original).  This has been applied in the context of the distribution or allowances of

---

[36]     See also, e.g., Woodward v. Morgenthau, 740 F. Supp. 2d 433, 438 (S.D.N.Y. 2010); Banks
v. Stewart, 08 Civ. 7463, 2010 WL 2697075 at *9-10 (S.D.N.Y. July 6, 2010); Walker v.
Shaw, 08 Civ. 10043, 2010 WL 2541711 at *8 (S.D.N.Y. June 23, 2010); Davis v. Shaw, 08
Civ. 0364, 2009 WL 1490609 at *1 (S.D.N.Y. May 20, 2009); Smart v. City of N.Y., 08 Civ.
2203, 2009 WL 862281 at *9 (S.D.N.Y. Apr. 1, 2009).

food, water, showers, periods of exercise, and medical and mental health treatment to pretrial detainees.  See, e.g., Azor v. City of N.Y., No. 08 CV 4473, 2012 WL 1117256 at *4 (E.D.N.Y. Mar. 30, 2012) (food and bathing); Felmine v. City of N.Y., No. 09-CV-3768, 2011 WL 4543268 at *22 (E.D.N.Y. Sept. 29, 2011) (food); Waters v. Luxama, 09 Civ. 4728, 2011 WL 1226421 at *2 (S.D.N.Y. Mar. 24, 2011) (food); Smart v. City of N.Y., 2009 WL 862281 at *9 (food, water and bathroom); Ruffino v. Lantz, No. 08-CV-1521, 2009 WL 3571306 at *3 (D. Conn. Oct. 28, 2009) (recreation); Webster v. City of N.Y., 333 F. Supp. 2d 184, 200 (S.D.N.Y. 2004) (food and water); Curry v. Kerik, 163 F. Supp. 2d 232, 235-36 (S.D.N.Y. 2001) (unsanitary and hazardous showering); Heisler v. Kralik, 981 F. Supp. 830, 838 (S.D.N.Y. 1997) (showers and recreation), aff'd, No. 97-2869, 164 F.3d 618 (table), 1998 WL 636985 (2d Cir. July 21, 1998); Davidson v. Coughlin, 968 F. Supp. 121, 134 (S.D.N.Y. 1997) (exercise); Cuoco v. Hershberger, 93 Civ. 2806, 1996 WL 648963 at *8 (S.D.N.Y. Nov. 6, 1996) (medical care); Irrizarry v. Kenny, 92 Civ. 1511, 1995 WL 678747 at *4 (S.D.N.Y. 1995) (medical care); see also, e.g., Silvera v. Conn. Dep't of Corr., 726 F. Supp. 2d 183, 190 (D. Conn. 2010) (mental health treatment); Atkins v. Cnty. of Orange, 372 F. Supp. 2d 377, 407-10 (S.D.N.Y. 2005) (mental health treatment), aff'd on other grounds, 248 F. App'x 232 (2d Cir. 2007); Burke v. Warren Cnty. Sheriff's Dep't, No. 90-CV-597, 1994 WL 675042 at *5 (N.D.N.Y. Nov. 25, 1994) (mental health treatment).

Punishment has been found when a correctional official denies a prisoner a necessity of life over a period of several months whenever that official was working.  See, e.g., Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983) ("While no court has explicitly held that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." (citation

omitted)); <u>Murphy</u> v. <u>Andrews</u>, No. 10CV0508, 2011 WL 5878351 at *4 (E.D. Tex. Oct. 11, 2011) ("[T]he summary judgment evidence, viewed in the light most favorable to the plaintiff, shows that [plaintiff] was repeatedly denied food, whenever [defendant] worked, over a period of several months, and that this denial was deliberately done for the very purpose of causing harm.  These allegations are sufficient to survive the defendant's motion for summary judgment."), <u>report & rec. adopted</u>, 2011 WL 5878347 (E.D. Tex. Nov. 23, 2011); <u>George</u> v. <u>McGinnis</u>, No. 05-CV-84, 2008 WL 4412109 at *5 (W.D.N.Y. Sept. 23, 2008) ("While the Court would have no difficulty determining that the denial of[, <u>inter alia</u>,] . . . exercise for twenty-three days was reasonably calculated to restore prison discipline and security in light of plaintiff's admission to possessing a container of feces in his cell, it could not justify withholding those items, as well as . . . [others] from plaintiff for sixty days, as plaintiff affirms."); <u>Curry</u> v. <u>Kerik</u>, 163 F. Supp. 2d at 236 ("Plaintiff's allegation that he was exposed to an unsanitary and hazardous showering area for over nine months is 'sufficiently serious' to meet the objective element of a Due Process claim based upon the conditions of his confinement."); <u>Arce</u> v. <u>Coughlin</u>, 93 Civ. 4702, 1996 WL 252371 at *5 (S.D.N.Y. May 14, 1996) ("If plaintiff was denied laundry service and prevented from cleaning his cell for 120 days, that could have resulted in hygiene conditions so poor as to deny plaintiff 'the minimal civilized measure of life's necessities.' . . .  At the very least, there exists an issue of fact as to the severity of the hygiene problem upon which plaintiff's Eighth Amendment claim is based.").

Absent a demonstration of an intent to punish, allegations of deprivation of the life necessities of a pretrial detainee are subject to the deliberate indifference analysis discussed above. (<u>See</u> cases on pages 31-36 above.)  <u>See</u>, <u>e.g.</u>, <u>Cruz</u> v. <u>Reiner</u>, No. 11 Civ. 2131, 2011 WL 6204101 at *4 (E.D.N.Y. Dec. 12, 2011); <u>Lesane</u> v. <u>City of N.Y.</u>, 11 Civ. 2104, 2011 WL 5242721 at *2

(S.D.N.Y. Nov. 3, 2011); Felmine v. City of N.Y., 2011 WL 4543268 at *21; Kondziela v. Cnty. of Erie, No. 09-CV-601, 2011 WL 4055163 at *3 (W.D.N.Y. Sept. 12, 2011); Dilworth v. Goldberg, 10 Civ. 2224, 2011 WL 3501869 at *19 (S.D.N.Y. July 28, 2011), report & rec. adopted, 2011 WL 4526555 (S.D.N.Y. Sept. 30, 2011); Waters v. Luxama, 2011 WL 1226421 at *2; Bourdon v. Roney, No. 99-CV-0769, 2003 WL 21058177 at *10 (N.D.N.Y. Mar. 6, 2003); Curry v. Kerik, 163 F. Supp. 2d at 236.

### 2.  Application Of The Conditions Of Confinement Legal Standard

Inesti asserts that he "was denied mental health treatment and transferred to Riker's Island Correctional Facility and placed in a (SHU) with no property alone in a cell for 24 hours a day denied any right to eat, shower, or out of cell relief."  (Dkt. No. 103: Inesti Opp Br. ¶¶ 8, 9, 13, 22, 23.)[37/]  Inesti asserts that these deprivations, as well as being housed in punitive segregation, caused him to suffer "pain[,] humiliation[,] emotional distress[,] mental anguish[,] and physical injuries that limited [his] ability to eat[,] sleep[,] or work."  (Dkt. No. 38: Compl. ¶ 138.)

Inesti's claims against the City defendants arising out of his incarceration at MHAUII from November 16, 2006 to January 16, 2007 are time-barred.  (See page 23 above.)

---

[37/]    To the extent Inesti is rasing a new claim that he was denied due process in being sent to MHAUII, this claim is precluded.  (See Inesti Opp. Br. at ¶¶ 8-13, 18 & at 13.)  Inesti had several opportunities to amend his complaint, and Inesti cannot now assert a new cause of action, against unknown defendants, after the close of discovery.  See, e.g., Silverman v. Miranda, 06 Civ. 13222, --- F. Supp. 2d ----, 2013 WL 141773 at *3 (S.D.N.Y. Jan. 4, 2013) ("Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment." (quotations omitted)); Lopez v. Gap, Inc., 883 F. Supp. 2d 400, 413 (S.D.N.Y. 2012); De La Rosa v. City of N.Y. Police Dep't, 09 Civ. 5290, 2010 WL 4177626 at *8 (S.D.N.Y. Oct. 22, 2010) ("Because these new claims appear for the first time in [summary judgment] opposition papers, they will not be considered by the Court."), aff'd 461 F. App'x 73 (2d Cir.), cert. denied, 133 S. Ct. 353 (2012).

Inesti also was incarcerated at MHAUII from October 19, 2008 to November 26, 2008 (see pages 4-5 above), but Inesti fails to provide any evidence to support his allegations.[38] Inesti provides affidavits from three MHAUII inmates.  (See Inesti Opp. Br. Ex. G: Santiago Aff., Salgado Aff., Collins Aff.)  Inesti is precluded from relying on the affidavits because Inesti failed to produce them to City defendants during discovery.  (See Dkt. No. 105: City Defs. Reply Br. at 5-6: Dkt. No. 106: Carey 2/28/13 Aff. ¶¶ 5-9 & Ex. M: Inesti Dep. at 76-80.)  After Inesti failed to produce the affidavits to City defendants, the Court warned Inesti that if he did "not produce the inmate affidavits, he [would] be precluded from using them on the summary judgment motion." (Dkt. No. 76: 11/30/12 Order at 2.)   In any event, only one affidavit provides any relevant information about Inesti.  (See Inesti Opp. Br. Ex. G: Santiago Aff., Salgado Aff., Collins Aff.) Melvin Collins stated that in July and August 2008, he witnessed Pressley and Dunbar "continuously harass and target inmate (Mike Inesti) in cell #13 by not feeding him, turning his water off for long ex[]tended periods of time, taunting, and having lower ranking officers physically abuse him, in the name of an 'extraction,' also refusing to give him medical attention."  (Inesti Opp. Br. Ex. G: Collins Aff.)  But according to Inesti's movement history, Inesti was not admitted to MHAUII Housing Area 13-A until October 19, 2008.  (See page 4 above; City Defs. Reply Br. at 6 n.5.)  Collins' statement thus is insufficient to create a material issue of fact.

Moreover, City defendants established that MHAUII correction officials manage inmates' food, showers, and recreation time, but not medication, which is dispensed by medical staff

---

[38]   While Inesti assets that he was housed in MHAUII from August 8, 2008 to November 21, 2008 (Compl. ¶ 104), Inesti's Movement History clearly demonstrates that he was incarcerated at MHAUII from October 19, 2008 to November 26, 2008 (see pages 4-5 above).

twice a day.  (See page 3 above.)  Deviations from standard procedure are noted in the logbook.

(See page 5 above.)  "The log book from Housing Area 13-A during the relevant time period clearly

shows that Mr. Inesti was entitled to and offered three meals a day, regular sanitation, access to

showers, out-of-cell relief, and medication (which he admits he sometimes refused)."  (See page 5

above.)  While it is unlikely that prison logbooks would reflect the wrongful denial of a condition

of confinement, Inesti does not contest the accuracy of the logbooks.  Inesti's conclusory allegations

without more are insufficient to defeat City defendants motion for summary judgment.[39/]

        Inesti asserts that he "was denied all of his personal property[, including] pens,

paper . . . and reading material." (Inesti Opp Br. ¶¶ 8, 9, 13, 23.)  Denial of such personal property,

---

[39/]    Compare Headley v. Fisher, 06 Civ. 6331, 2010 WL 2595091 at *4 (S.D.N.Y. June 28, 2010) (Crotty, D.J.) ("Contemporaneous Logbook entries eliminate any genuine issue of material fact that [plaintiff] was not deprived of opportunities to shower and go to recreation while under keep-lock status."), Jacoby v. Cnty. of Oneida, No. 05-CV-1254, 2009 WL 2971537 at *3 (N.D.N.Y. Sept. 11, 2009) ("Although Plaintiff contends, in his objections, that prison officials . . . fabricate[d] the log book, he supplies no evidence to support these conclusory allegations."), and Gaston v. Coughlin, No. 98-CV-6016, 2005 WL 1177869 at *13 (W.D.N.Y. May 18, 2005) (Plaintiff "has submitted no affidavit or other sworn evidence challenging Defendant's statements, which are supported both by factual allegations and copies of the relevant log books . . . .  [Plaintiff's] argument ignores the fact that nothing within the Activity Log supports his assertion that there was sewage, feces and urine in the area in front of [plaintiff's] SHU cell, or even nearby, on any of the days in question, and [plaintiff's] bald, conclusory statement to the contrary is insufficient to defeat summary judgment." (citation omitted)), with Headley v. Fisher, 2010 WL 2595091 at *4 (Plaintiff "testified, however, that during his keep-lock confinement, another inmate provided him with only small amounts of food—not the meals to which he was entitled. . . .  While this is not the strongest case, it cannot be said that there is no genuine issue of material fact with regard to [plaintiff's] claim that he was deprived of his meals during his keep-lock status.  Certainly Defendants have produced no evidence that [plaintiff] received regular meals."), and Moncrieffe v. Witbeck, No. 97-CV-253, 2000 WL 949457 at *6 (N.D.N.Y. June 29, 2000) ("Because these logbooks do not contain clear entries for some of the dates in issue and would not likely reflect the wrongful denial of meals to an inmate by a corrections officer, they do not establish  as a matter of law that defendants never denied plaintiff food.").

especially for a period of only thirty-seven days, is not sufficiently serious to sustain a condition of confinement claim.  See, e.g., Stewart v. Howard, No. 09-CV-69, 2010 WL 3907137 at *3 (N.D.N.Y. Sept. 30, 2010) (denial of personal property was not sufficiently serious to sustain a condition of confinement claim); Reeder v. Hogan, No. 09-CV-520, 2010 WL 3909050 at *8 (N.D.N.Y. Sept. 30, 2010) ("New York in fact affords an adequate post-deprivation remedy [for the deprivation of personal property] in the form of, inter alia, a Court of Claims action . . . .  This adequate post-deprivation state remedy would thus preclude [the plaintiff's] due process claim under § 1983 even if he had exhausted his administrative remedies.  Accordingly, defendants' motion to dismiss plaintiff's claim that defendants unconstitutionally deprived him of his personal property, is granted." (citations & quotations omitted)); Dixon v. Goord, 224 F. Supp. 2d 739, 748 (S.D.N.Y. 2002) (Plaintiff's "allegations of having been cut off from . . . personal property . . . and other normal incidents of SHU confinement, are not violations of the Eighth Amendment."); Salahuddin v. Dalsheim, 94 Civ. 8730, 1996 WL 384898 at *14 (S.D.N.Y. July 9, 1996) (deprivation of, inter alia, personal property for seven days did not establish an objectively serious deprivation).

While Inesti alleges he was denied food (see Inesti Opp Br. ¶¶ 8-9, 13, 23), he failed to support his allegation with any evidence.  At MHAUII, food is served three times a day, and if an inmate refuses food, the matter is referred to the mental health department.  (See page 3 above.) While Inesti missed one lunch on October 22, 2012 because there was not enough food in the meal cart (see page 5 above), missing one meal is not sufficient to establish a constitutional violation. See, e.g., Hooks v. Howard, No. 07-CV-0724, 2010 WL 1235236 at *13 (N.D.N.Y. Mar. 30, 2010) (Being "'denied the morning meal,'" "alleged by plaintiff to have occurred only on one occasion, while not to be condoned, are nonetheless de minimis and do not rise to a level of constitutional

significance."); Benjamin v. Kooi, No. 07-CV-0506, 2010 WL 985844 at *11 (N.D.N.Y. Feb. 25, 2010) ("Based on this record, no reasonable fact-finder could conclude that . . . being denied two or three meals would deprive [plaintiff] of the minimal measures of necessities required for civilized living."), report & rec. adopted, 2010 WL 985823 (N.D.N.Y. Mar. 17, 2010); Parker v. Peek-Co, No. 06-cv-1268, 2009 WL 211371 at *4 (N.D.N.Y. Jan. 27, 2009) ("While plaintiff alleges that he was deprived of two meals on that date as a result of the defendant's actions, such a deprivation, while not to be condoned, is de minimis and does not rise to a level of constitutional significance."); Cruz v. Church, No. 05-CV-1067, 2008 WL 4891165 at *12 (N.D.N.Y. Nov. 10, 2008) ("If . . . meals[] are withheld from a prisoner on an isolated basis, such conduct, though not necessarily to be condoned, does not typically rise to a level of constitutional significance."); Cagle v. Perry, No. 04-CV-1151, 2007 WL 3124806 at *14 (N.D.N.Y. Oct. 24, 2007) (deprivation of two meals is "not sufficiently numerous, prolonged or severe to rise to the level of an Eighth Amendment violation"); Barclay v. New York, 477 F. Supp. 2d 546, 555 (N.D.N.Y. 2007) (being denied food for two or three days for a messhall violation did not constitute a constitutional violation).

Inesti asserts that he was denied adequate clothing, only receiving a "smock." (Inesti Opp Br. ¶ 23; Dkt. No. 80: Carey 12/10/12 Aff. Ex. A: Inesti Dep. at 45-46.) Inesti said that he was given the smock because he "was out of control." (Carey 12/10/12 Aff. Ex. A: Inesti Dep. at 46.) Inesti acknowledged that the officers said he was "out of control" "[p]robably because the way [he] was acting. . . . [He] wasn't on [his] medication and [he] was hysterical and going through a whole bunch of problems with [his] mental illness." (Carey 12/10/12 Aff. Ex. A: Inesti Dep. at 46-47.) While wearing a smock may be unpleasant, Inesti's claim that he was denied clothing and only provided a smock does not rise to the level of a constitutional violation. See, e.g., Reeder v. Hogan,

No. 09-CV-520, 2012 WL 4107822 at *21 (N.D.N.Y. July 11, 2012) ("Plaintiff further alleges he was extremely cold, had only a short-sleeved green state shirt, no sheets, blanket, . . . sweatshirt . . . for six days.  Such conditions may have been unpleasant for plaintiff, but he has failed to establish an issue of fact as to if the conditions were wantonly imposed for the unnecessary infliction of pain or that they posed a threat to his health or safety." (citation & fns. omitted)), report & rec. adopted, 2012 WL 4106740 (N.D.N.Y. Sept. 19, 2012); Borges v. McGinnis, No. 03-CV-6375, 2007 WL 1232227 at *6 (W.D.N.Y. Apr. 26, 2007) (keeping inmate clothed only in paper gown and paper slippers with a thin mattress and no blanket in a room with an open window for three days did not meet the objective element of an Eighth Amendment violation where "plaintiff [did] not allege that he suffered anything more than frustration and discomfort"); McNatt v. Unit Manager Parker, No. 99CV1397, 2000 WL 307000 at *4 (D. Conn. Jan. 18, 2000) (totality of conditions in restrictive housing unit, including no clothing for six days and no shower shoes, while not pleasant, did not rise to the level of Eighth Amendment violation); Salahuddin v. Dalsheim, 1996 WL 384898 at *3, *14 (for inmate who was not referred to mental health services, the deprivation "of his belt, shoe laces, and personal property for seven days, subjected to 24-hour observation, placed with mentally ill inmates, denied a change of 'Greens'" did not establish an objectively serious deprivation).

Inesti contends that he was denied recreation.  (Inesti Opp Br. ¶¶ 8-9, 13, 23.) According to MHAUII procedures, inmates are allowed one hour of out-of-cell recreation daily, which the inmate may refuse or recreation may be denied for failure to comply with security procedures.  (See page 3 above.)  City defendants established that Inesti was offered recreation, but that he refused recreation on a regular basis.  (See page 5 above.)  Inesti's access to but refusal to participate in recreation, for no more than 37 days, does not establish a constitutional violation.  See,

e.g., Willard v. Ramsey, No. 07-CV-1156, 2010 WL 786296 at *3 n.10 (N.D.N.Y. Mar. 2, 2010)

("While [plaintiff] contends that he was deprived of showers and recreation, such claims are

contradicted by the record which establishes that [plaintiff] was offered such activities and he

refused to participate in them on numerous occasions. [Plaintiff's] access to, and refusal to accept,

showers were the result of his own decisions and not unconstitutional conditions of confinement.

The same is true of his recreational time."); Davis v. Castleberry, 364 F. Supp. 2d 319, 322

(W.D.N.Y. 2005) (granting summary judgment for defendants where "DOCS records indicate that

plaintiff himself chose not to avail himself of his opportunities for exercise"); see also, e.g., Barnes

v. Craft, No. 04-CV-1269, 2008 WL 3884369 at *9 (N.D.N.Y. Aug. 18, 2008) (Denial of outdoor

exercise "for six days [was] simply not sufficiently severe and prolonged to rise to the level of an

Eighth Amendment violation."); Barclay v. New York, 477 F. Supp. 2d at 555 (There "is no

evidence that [plaintiff] suffered any ill effects from denial of exercise, and there is no evidence that

plaintiff was denied recreation for any reason other than as a disciplinary measure."); Gibson v. City

of N.Y., 96 Civ. 3409, 1998 WL 146688 at *3 (S.D.N.Y. Mar. 25, 1998) ("[T]he deprivation of the

opportunity to participate in recreation for eight days in a sixty day period, even when coupled with

the deprivation of an opportunity to exercise on two consecutive days, is not sufficiently serious to

constitute punishment under the Fourteenth Amendment."); Gill v. Pact Org., 95 Civ. 4510, 1997

WL 539948 at *10 (S.D.N.Y. Aug. 28, 1997) (twenty-six days of administrative segregation with

deprivation of exercise "does not state a claim for denial of a cognizable liberty interest"); Davidson

v. Coughlin, 968 F. Supp. 121, 131 (S.D.N.Y. 1997) (deprivation of outdoor exercise for fourteen

days did not violate Eighth Amendment).

Inesti asserts that he was denied showers, soap and toothpaste.  (Inesti Opp Br. ¶¶ 8-

9, 13, 23.)  While showers are offered daily, inmates may refuse or be denied a shower if they fail

to comply with security procedures.  (See page 3 above.)  Inesti fails to provide any evidence that he was regularly denied showers, soap or toothpaste, and the logbook fails to note any deviations. Inesti's bald assertion is insufficient to overcome City defendants' summary judgment motion.  See, e.g., Willard v. Ramsey, 2010 WL 786296 at *3 n.10 ("While [plaintiff] contends that he was deprived of showers . . . , such claims are contradicted by the record which establishes that [plaintiff] was offered such activities and he refused to participate in them on numerous occasions. [Plaintiff's] access to, and refusal to accept, showers were the result of his own decisions and not unconstitutional conditions of confinement. . . .  Moreover, [plaintiff] admits to at least taking one shower part way through his confinement.  'Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers.'"); McCoy v. Goord, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) ("two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs'").[40/]

The City defendants' summary judgment motion should be GRANTED as to Inesti's conditions of confinement claims against Dunbar and Pressley.

---

[40/]  See also, e.g., Reeder v. Hogan, 2012 WL 4107822 at *21 ("Plaintiff further alleges he . . . [had no] soap, washcloth, . . . towel, . . . toothbrush, toothpaste, or toilet paper for six days. Such conditions may have been unpleasant for plaintiff, but he has failed to establish an issue of fact as to if the conditions were wantonly imposed for the unnecessary infliction of pain or that they posed a threat to his health or safety." (citation & fns. omitted)); Davidson v. Murray, 371 F. Supp. 2d 361, 373 (W.D.N.Y. 2005) ("Likewise, on this record, no reasonable juror could find that plaintiff has satisfied the subjective element-i.e., that any of the named defendants knew plaintiff's need for personal hygiene and cleaning items posed an excessive risk to his health or safety at any time, yet disregarded that risk."); Chavis v. Kienert, No. 03-CV-0039, 2005 WL 2452150 at *21 (N.D.N.Y. Sept. 30, 2005) (denial of toiletries for a two-month period did not rise to the level of deliberate indifference to the prisoner's health or safety).

B.     **Deliberate Indifference To Mental Health Needs**

Inesti further alleges that Captains Dunbar and Pressley were deliberately indifferent to his need for proper mental health treatment.  (Dkt. No. 38: Compl. ¶ 16, 105.)  While Inesti asserts that he was not getting any mental health treatment while at MHUAII, he acknowledges being offered and taking medication, as well as refusing medication when he was delusional.  (Dkt. No. 80: Carey 12/10/12 Aff. Ex. A: Inesti Dep. at 44-45.)  Inesti also admits that counselors went around at MHAUII but he "was not getting no out-of-cell relief."  (Carey 12/10/12 Aff. Ex. A: Inesti Dep. at 44.)

In any event, Inesti has failed to establish the personal involvement of Dunbar and Pressley as to his mental health treatment; it would be entirely appropriate for Captains Dunbar and Pressley to defer to medical staff as to Inesti's mental health treatment.  See, e.g., Daley v. VonHagen, No. 11-CV-1071, 2012 WL 4464861 at *5 (W.D.N.Y. Sept. 20, 2012) ("Superintendents and deputy superintendents . . . 'are not generally involved in the treatment of inmates . . . ,' and it is generally reasonable for non-medical personnel to rely on qualified medical staff to deal with an inmate's medical needs." (citation omitted)); Hardy v. Diaz, No. 08-CV-1352, 2010 WL 1633379 at *7 (N.D.N.Y. Mar. 30, 2010) ("The Superintendent cannot be liable under Section 1983 for failure to supervise the prison medical staff, because he lacks the medical training and authority to do so."), report & rec. adopted, 2010 WL 1633390 (N.D.N.Y. Apr. 21, 2010); Gonzales v. Wright, No. 06-CV-1424, 2010 WL 681323 at *10 (N.D.N.Y. Feb. 25, 2010) ("The Superintendent's and Deputy Superintendent's delegation of medical judgment to appropriate staff was proper as the Second Circuit has cautioned that non-medical Defendants should not intercede in the medical care and treatment of an inmate. . . .   Concomitantly, the Second Circuit has also explicitly held the denial of a grievance on medical matter is insufficient to demonstrate personal involvement on behalf of

a prison Superintendent." (citations omitted)); Kemp v. Wright, No. 01 CV 562, 2005 WL 893571 at *9 (E.D.N.Y. Apr. 19, 2005) (dismissing personal involvement claim against non-medical superintendents where plaintiff claims that they failed to intercede in his medical treatment); McKenna v. Wright, 01 Civ. 6571, 2004 WL 102752 at *5 (S.D.N.Y. Jan. 21, 2004) (Plaintiff's "position that [commissioner] is personally liable for 'his failure to ensure' that [associate commissioner and chief medical officer] properly resolved [plaintiff's] grievance, is merely an end-run around the legal standard and fails to establish [commissioner's] personal involvement." (citation omitted)).[41]

Accordingly, the City defendants' summary judgment motion should be GRANTED as to Inesti's deliberate indifference claims against Dunbar and Pressley.

**CONCLUSION**

For the reasons stated above, the State defendants' and City defendants' motions for summary judgment (Dkt. Nos. 78, 87) should be GRANTED.

**FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.[42]  Such objections (and any responses to objections) shall be

---

[41]  See also, e.g., Gonzales v. Carpenter, No. 08-CV-629, 2011 WL 768990 at *5 (N.D.N.Y. Jan. 3, 2011) (no personal involvement against non-medical correctional officer because the correctional officer had no influence over the plaintiff's medical treatment), report & rec. adopted, 2011 WL 767546 (N.D.N.Y. Feb. 25, 2011); Smith v. Woods, No. 05-CV-1439, 2008 WL 788573 at *9 (N.D.N.Y. Mar. 20, 2008) (prison social worker and psychologist had no authority to override treating psychiatrist's treatment of an inmate).

[42]  If Inesti requires copies of any of the cases reported only in Westlaw, he should request copies from defendants' counsel.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.2.

57

filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable

Paul A. Crotty, 500 Pearl Street, Room 735, and to my chambers, 500 Pearl Street, Room 1370.

Any requests for an extension of time for filing objections must be directed to Judge Crotty (with

a courtesy copy to my chambers).   Failure to file objections will result in a waiver of those

objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Ingram v.

Herrick, 475 F. App'x 793, 793 (2d Cir. 2012); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d

1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984

F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S.

1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir.

1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d

234, 237-38 (2d Cir. 1983).

Dated:       New York, New York
             March 5, 2013

                                        Respectfully submitted,

                                        _____
                                        **Andrew J. Peck**
                                        United States Magistrate Judge


Copies **by ECF** to:      Mark Inesti (Mail)
                           Jason Alan Buskin, Esq.
                           Charles Edward Carey, Esq.
                           Chlarens Orsland, Esq.
                           Judge Paul A. Crotty