```
                                                    ┌─────────────────────────────────┐
                                                    │ USDC SDNY                       │
                                                    │ DOCUMENT                        │
UNITED STATES DISTRICT COURT                        │ ELECTRONICALLY FILED            │
SOUTHERN DISTRICT OF NEW YORK                       │ DOC #: _____         │
--------------------------------------------------X │ DATE FILED: September 30, 2013  │
MARK INESTI,                                        └─────────────────────────────────┘
                        Plaintiff,

            -against-
                                                    11 Civ. 2596 (PAC) (AJP)
                                                    ORDER ADOPTING R&R

MICHAEL F. HOGAN, PHD., et al.

                        Defendants.
--------------------------------------------------X
```

HONORABLE PAUL A. CROTTY, United States District Judge:

Pro se plaintiff Mark Inesti brings this § 1983 action against New York City and New York State officials for violating his rights during his confinement.  Inesti claims that Captain Sherma Dunbar (now Assistant Deputy Warden) and Captain Anna Pressley (collectively the "City Defendants") were deliberately indifferent to his mental health needs and unconstitutional conditions of confinement at the Mental Health Assessment Unit for Infracted Inmates ("MHAUII") at the George R. Vierno Center on Rikers Island.  Inesti also claims that Michael Hogan, former Commissioner of the Office of Mental Health, Steven Rabinowitz, former Executive Director of the Manhattan Psychiatric Center ("MPC"), and Dr. Tom Tuzel (collectively the "State Defendants") mistreated him or were deliberately indifferent to his mental health treatment at various times that he was at MPC (September 2007 to November 2007) and Kirby Forensic Psychiatric Center ("Kirby") (November 2008 to January 2009), facilities which are operated by the NY State Office of Mental Health ("OMH").  Inesti also accuses Tuzel of forcibly injecting him with medication, without Inesti's consent.

The City and State Defendants moved for summary judgment.  In a thorough and comprehensive Report and Recommendation ("R&R"), Magistrate Judge Peck concluded that the motions should be granted. Upon consideration of Magistrate Judge Peck's excellent

analysis and Inesti's objections, which merely repeat arguments made to and rejected in the R&R, the Court adopts the R&R in full and grants the City and State Defendants' motions for summary judgment.

## BACKGROUND

### I.  FACTS[1]

On November 16, 2006 while in jail at Rikers Island, Inesti was sent to the George R. Vierno Center ("GRVC") Mental Health Assessment Unit for Infracted Inmates ("MHAUII") as a result of a disciplinary infraction.  (DiCarlo Aff. ¶ 6 & Ex. H at 2.)  Inesti alleges that while he was detained there, he was diagnosed with schizoaffective one disorder and prescribed medication.  Inesti alleges that during this period, he was locked in his cell for twenty-four hours a day and denied showers. He also alleges that staff denied him meals while Defendants Sherma Dunbar and Anna Pressley, both captains at Rikers, were on duty.

MHAUII correction officers manage inmates' food, showers, and recreation time, but not medication, which is dispensed by medical staff twice a day.  While showers are offered daily, inmates may refuse a shower, or be denied one, if they fail to comply with security procedures.  MHAUII inmates are allowed one hour of out-of-cell recreation daily; but inmates may refuse recreation or be denied recreation for failing to comply with security procedures.

On January 16, 2007, Inesti was discharged from MHAUII and City Department of Correction ("DOC") custody.  (City Defs. Rule 56.1 Stmt. ¶ 18.)  On September 24, 2007, Inesti was admitted to the Manhattan Psychiatric Center ("MPC") pursuant to a final C.P.L. Article 730 Order. Inesti was diagnosed with schizoaffective one disorder and was prescribed

---

[1] Inesti failed to comply with Local Civil Rule 56.1(b).  Accordingly, the Court admits as fact and relies on the facts stated in City and State Defendants' Rule 56.1 Statements.  See Gadsden v. Jones Lang Lasalle AMs., Inc., 210 F. Supp/ 2d 430, 438 (S.D.N.Y. 2002)(collecting cases and stating "Courts in this circuit have not hestitated to deem admitted the facts in a movant's Local [Civil] Rule 56.1 Statement that have not been controverted by a Local Rule 56.1 statement from the non-moving party.").

medication.  Inesti claims that staff members from MPC and the Kirby Forensic Psychiatric Center ("Kirby") sedated him via injections because he had become combative.  He contends that staff left him in a room without a bed, and that he urinated on himself as a result of the injections.

Inesti sent complaint letters to Dr. Rabinowitz, the Executive Director of MPC and Kirby. As a result, Rabinowitz "called [Inesti] to his office and [Rabinowitz] gave [Inesti] the transitional services that [Inesti] requested for a treatment plan." (Buskin Aff. Ex. A: Inesti Dep. at 113.)  Accordingly, Inesti was transferred to MPC's Transitional Living Residence ("TLR") on November 23, 2007.  (Rabinowitz Aff. ¶ 3.)  Inesti subsequently struck a TLR nurse and was arrested for assault. Inesti never saw Rabinowitz again after leaving MPC.

On August 8, 2008, Inesti was arrested for attempting to steal clothing from a department store and sent to Rikers Island.  On October 2, 2008, Inesti was sent to Bellevue Hospital Prison Ward for a psychiatric evaluation pursuant to a C.P.L. Article 730 Order. Subsequently, Inesti was found guilty of an assault on DOC staff with a weapon on October 19, 2008 and sent to MHAUII Housing Area 13-A.  (DiCarlo Aff. Ex. I: Inesti Movement History at 9.)

While at MHAUII Housing Area 13-A, Inesti claims that he was subject to a variety of mistreatment, including deprivation of food, showers, and out-of-cell time.  The logbook from Housing Area 13-A during the relevant time, however, "clearly shows that Mr. Inesti was entitled to and offered three meals a day, regular sanitation, access to showers, out-of-cell relief, and medication (which he admits he sometimes refused)."  (City Defs. Rule 56.1Stmt. ¶ 30; Dkt. No. 82: Kril Aff Ex. L: GRVC 13-A Logbook.)  Deviations from standard procedure would be noted in the logbook.  (City Defs. Rule 56.1 Stmt. ¶ 31.)  Inesti testified that, while at MHAUII Housing Area 13-A: "[he] wasn't really too stable or anything.  [Inesti] was argumentative and probably even abusive or violent because of what

3

[he] was going through or not taking any medication . . . . ".  (Carey 12/10/12 Aff. Ex. A: Inesti Dep. at 32, 46-47, 60.)

On November 21, 2008, Inesti was placed in the custody of OMH after being indicted for robbery and found unfit for trial.  On November 26, 2008, pursuant to a C.P.L. Article 730 Order, Inesti was admitted to Kirby where Defendant Dr. Tom Tuzel was his treating doctor.  (Dkt. No. 89: Tuzel Aff. ¶ 4.)  Inesti received psychotropic intramuscular medication on four occasions while at Kirby, three of which were administered without Inesti's consent. (Tuzel Aff. ¶ 6 & Ex. B: Inesti Med. Records.)

Dr. Tuzel was personally involved only in one instance of Inesti receiving psychotropic intramuscular medication without consent.  (Tuzel Aff. ¶ 6.)  On December 26, 2008, Inesti complained  that he was feeling "'anxious,' 'nervous,' and 'irritable.'"  (Tuzel Aff. ¶ 8 & Ex. B: Inesti Med. Records at 204-05.)  Inesti became "'irritable,' 'loud,' and 'angry'" and went into Dr. Tuzel's office yelling and screaming.  Id.  Inesti was offered and refused intramuscular medication.  Id.  After concluding that Inesti presented a danger to himself and others due to his hostile and violent behavior, Dr. Tuzel prescribed Lorazepam for anxiety, Haloperidone for schizophrenia symptoms, and Diphenhydramine, a sleep aid.  (Tuzel Aff. ¶ 8 & Ex. B: Inesti Med. Records at 204-05.)  Inesti conceded that the injections stabilized and calmed him.  (Buskin Aff. Ex. A: Inesti Dep. at 136.)

While at Kirby, Inesti never wrote Commissioner Hogan regarding his treatment (Buskin Aff. Ex. A: Inesti Dep. at 105.); Inesti wrote a few letters to Rabinowitz but never spoke with Rabinowitz regarding his treatment.  (Buskin Aff. Ex. A: Inesti Dep. at 115-16, 145-46.)  Rabinowitz did not make the determination that Inesti was competent to stand trial or sign the corresponding paperwork.  (State Defs. Rule 56.1 Stmt. ¶¶ 45-46; Rabinowitz Aff. ¶ 8.)

On January 5, 2009, Kirby forensic psychiatrists determined that Inesti was competent to stand trial.  On January 15, 2009, the New York Supreme Court transferred Inesti from Kirby to DOC custody and directed him to appear in court on January 28, 2009. (Tuzel Aff. ¶ 4.)

## II.  PROCEDURAL HISTORY

Inesti's original complaint was signed on April 20, 2010 (Dkt. No. 2: Orig. Compl. at 14), but the mailing envelope was postmarked April 7, 2011.  Inesti does not indicate when he gave his original complaint to prison officials for delivery to the Court.  The Court received Inesti's original complaint on April 12, 2011.  The City and State Defendants moved to dismiss Inesti's Second Amended Complaint.  (Dkt. Nos. 40, 42.)  This Court granted in part and denied in part the motions to dismiss.

The City and State Defendants now move for summary judgment on the remaining claims in Inesti's second amended complaint.  The State Defendants' summary judgment motions argue that (1) Inesti's claims arising out of his incarceration at MPC are time-barred; (2) Hogan was not personally involved in the alleged deprivation of Inesti's rights; (3) Rabinowitz was not personally involved in the alleged deprivation of Inesti's rights and did not retaliate against Inesti; (4) Dr. Tuzel did not violate Inesti's rights; and (5) the State Defendants are entitled to qualified immunity.

The City Defendants' summary judgment motion argues that: (1) Inesti's claims against Dunbar and Pressley arising out of his first incarceration at MHAUII are time-barred; (2) Inesti failed to exhaust his administrative remedies; (3) the City Defendants were not deliberately indifferent to Inesti's conditions of confinement or medical needs.

Magistrate Judge Peck submitted an R&R recommending that all of State and City Defendants' motions for summary judgment be granted.  Plaintiff Mark Inesti filed

objections to the R&R on April 22, 2013.  City Defendants filed responses to Plaintiff's objections to the R&R on May 24, 2013, and State Defendants filed responses to Plaintiff's objections to the R&R on May 28, 2013.

For the reasons below, this Court now adopts Magistrate Judge Peck's R&R in full, and grants all motions for summary judgment in State and City Defendants' favor.

## DISCUSSION

### I.  STANDARDS OF REVIEW

#### A.  Review of Magistrate Judge Peck's Report and Recommendation

A district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  When a timely objection has been made to the magistrate's recommendations, the court is required to review the contested portions de novo.  Pizzaro v. Bartlett, 776 F. Supp. 815, 817 (S.D.N.Y. 1991).  The court, however, "may adopt those portions of the Report to which no objections have been made and which are not facially erroneous."  La Torres v. Walker, 216 F. Supp. 2d 157, 159 (S.D.N.Y. 2000).  Moreover, "[w]hen a party makes only conclusory or general objections . . . the [c]ourt will review the Report strictly for clear error . . . . Objections to a Report must be specific and clearly aimed at particular findings in the magistrate judge's proposal."  Molefe v. KLM Royal Dutch Airlines, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009) (citations omitted).

#### B.  Summary Judgment

Summary judgment is appropriate where the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material if it "might affect the outcome of the suit under governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving

party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.  The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented. See, e.g., Apex Oil Co. v.DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977 (1987).

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact.  See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).  Once the moving party has made an initial showing that no genuine issue of material fact remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory allegations, conjecture, and speculation," Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003), but must instead present specific evidence in support of its contention that there is a genuine dispute as to material facts. Fed. R. Civ. P. 56(e).

Where a party opposing summary judgment is proceeding on a pro se basis, the Court must read that party's papers liberally and interpret them "to raise the strongest arguments that they suggest." McPherson v. Coombe, 174 F.3d 276 at 280 (2d Cir. 1999). Nonetheless, even a pro se plaintiff cannot defeat a motion for summary judgment by relying merely on the allegations of a complaint.  See Champion v. Artuz, 76 F.3d 483, 485 (2d Cir. 1996). Rather, when confronted with evidence of facts that would support summary judgment, a

plaintiff must come forward with evidence in an admissible form and capable of refuting those facts. Fed. R. Civ. P. 56(e).

## II.  INESTI'S OBJECTIONS TO MAGISTRATE PECK'S R&R RECOMMENDING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS ON ALL CLAIMS

### A.  Inesti's "Revolving Door" Claim for Post-Release Mental Health Treatment

Inesti argues that, due to the City's failure to provide him with mental health treatment, he was caught in a "revolving door" of homelessness and recidivism between 2006 and 2008. (Dkt. No. 38: Compl. ¶¶ 72-99.)  Magistrate Judge Peck recommended granting the City and State Defendants summary judgment on this claim.  As Inesti does not raise a specific objection to Magistrate Judge Peck's finding in the R&R,[2] the Court reviews the R&R only for clear error.

Although city and state officials have a duty to provide for the safety and well-being of individuals in their custody, DeShaney v. Winnebago Cnty. Dep't of Social Servs., 489 U.S. 189, 199-200 (1989), that duty ends when the individual is no longer in city or state custody.  Id. at 201 ("[T]he State does not become the permanent guarantor of an individual's safety by having once offered him shelter.").  Here, Inesti's homelessness and the incidents leading to his re-arrest occurred after he left the custody of the City and State. The Court cannot create a duty where none exists.  Furthermore, as Magistrate Judge Peck found, even if such a duty did exist, Inesti has provided no evidence that the named defendants had any responsibility to arrange continuing post-release mental health care for him.

---

[2] At various places in his objections to Magistrate Judge Peck's R&R, Inesti raised a general objection that he did not have a full and fair opportunity to participate in discovery.  Plaintiff had more than adequate time – just under four months, from Aug. 3 to Nov. 21, 2012 – to seek discovery.  Plaintiff fails to show what questions he could not ask Defendants, or how he was prejudiced in discovery. Plaintiff therefore does not meet the requirement of Federal Rule of Civil Procedure 56(d).

Because there is no clear error in Magistrate Judge Peck's recommendation, the Court adopts it; the Court grants City and State Defendants' motion for summary judgment as to Inesti's "revolving door" claim.

### B. Inesti's Claims Prior to April 7, 2008

Inesti alleges that the statute of limitations should be tolled for his § 1983 claims that would otherwise be time-barred because of his mental illness. Magistrate Judge Peck rejected that argument and recommended granting the City and State Defendants summary judgment on Inesti's claims prior to April 7, 2008.

Inesti objects. He argues that the continuous treatment toll should apply to his claims. The continuous treatment toll, however, applies to malpractice claims, not Inesti's claims pertaining to his conditions of confinement and his other time-barred claims. To the extent that Inesti's claims can be classified as malpractice claims such that the toll would apply, these claims do not rise to the level of constitutional violations. See Estelle v. Gamble, 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Inesti also contends that he has "clearly show[n] with supporting documents that he was not mentally fit to file a claim against State or City Defendants." While he refers to the "Weisman report" and the "Kunz report," Inesti fails to point to any specific facts in the record that dispute Magistrate Judge Peck's finding. As such, the Court reviews the R&R only for clear error.

The statute of limitations for a § 1983 action is three years and it begins to run at the time the plaintiff knows or has reason to know his injury. Melendez v.Greiner, 477 F. App'x 801, 803 (2d Cir. 2012), cert. denied, --- S. Ct. ----, 2013 WL 598715 (Feb. 19, 2013);

Covington v. City of N.Y., 171 F.3d 117, 121 (2d Cir. 1999), cert.denied, 528 U.S. 946 (1999). State law determines whether the statute of limitations should be tolled, so long as the state law does not undermine the goals of 1983.  Abbas v. Dixon, 480 F.3d 636, 641 (2d Cir. 2007).  New York's state law, C.P.L.R. § 208, provides a toll for "insanity," and this toll has been held to not violate the goals of 1983.  See Shonowsky v. City of Norwich, No. 10-CV-0745, 2011 WL 4344028 at *3 (N.D.N.Y. Apr. 18, 2011) (holding C.P.L.R.§ 208 to be consistent with the policy underlying § 1983).  While C.P.L.R. § 208 does not define insanity, the toll is to be narrowly interpreted to apply to "only those individuals who are unable to protect their legal rights because of an over-all inability to function in society." McCarthy v. Volkswagen of Am., Inc., 55 N.Y.2d 543, 548 (1982).  Consequently, courts have held that merely having a mental illness is not enough to qualify an individual for the toll. See Swartz v. Berkshire Life Ins. Co., 2000 WL 1448627 at *5 (S.D.N.Y. Sept. 28, 2000) ("Difficulty in functioning is not sufficient to establish insanity for the purposes of § 208; rather, the plaintiff must be totally unable to function as a result of a 'severe and incapacitating' disability.").

Inesti's original complaint was filed on April 7, 2011.  See Inesti v. Hicks, 11 Civ. 2596, 2012 WL 3822224 (S.D.N.Y. Sept. 4, 2012)(Crotty, D.J.).  Consequently, absent tolling, Inesti's § 1983 claims prior to April 7, 2008 are untimely.

Inesti has not met his burden to prove that he was completely unable to function during the time that his claims prior to April 7, 2008 accrued.  The reports to which Inesti refers the Court make no specific references to this time period, let alone demonstrate that he was insane at the time.  The one section of the Weisfeld report that references 2006 and 2007 merely notes Inesti's discharge from Manhattan Psychiatric Center.  To the extent that the Kunz report references Inesti's past history, the report diagnoses Inesti as "malingering:" "faking signs and symptoms of mental illness for secondary gain."  The report states that

malingering is "consistent with [Inesti's] history." Furthermore, the Kunz report concludes that Inesti had either no or minimal impairment of perception, impairment of intelligence, and other functions at the time of the report. Inesti's reference to this report undermines his position.

Furthermore, Inesti admits that during his incarceration at MPC from September 24, 2007 to November 23, 2007, he filed complaints to medical staff. His complaints were effective in obtaining a transfer to a transitional program that he desired. His ability to pursue extrajudicial remedies demonstrate that he experienced lucid intervals and was able to protect his rights during the statutory period, rendering him ineligible for the benefit of the toll. See, e.g., Hills v. Praxair, Inc., No. 11-CV-678, 2012 WL 1935207 at *12 (W.D.N.Y. May 29, 2012)(asserting workers' compensation claim and engaging in settlement discussions evidenced plaintiff's ability to assert his legal rights); de los Santos v. Fingerson,1998 WL 740851 at *5 (S.D.N.Y. Oct. 23, 1998) (§ 208 tolling denied where plaintiff maintained psychiatric appointments and pursued rights before Worker's Compensation Board).

Inesti further protests that if he were to be granted a hearing, he could prove that he was insane during the time in question. Inesti is not entitled to such a hearing when evidence in the record militates against a finding of insanity. See de los Santos, 1998 WL at *5 ("[I]t would strain logic to require that a hearing be held where a plaintiff has not only failed to satisfy his burden of showing insanity, but has also himself submitted evidence that establishes conclusively the lack of such disability.").

While Inesti may have a mental illness, that does not mean he is insane within the meaning of § 208. Accordingly, Inesti's claims against the City Defendants arising out of his incarceration at MHAUII from November 16, 2006 to January 16, 2007 and against the State Defendants arising out of his incarceration at MPC from September 24, 2007 to November

23, 2007 are time-barred and the Court grants summary judgment on all claims prior to April 7, 2008.

### C. Inesti's Claims Against the State Defendants

### 1. Defendant Hogan and Defendant Rabinowitz's Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (internal quotation omitted).  While some aspects of the Second Circuit's holding in Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) may be in question after Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009), the Court holds that liability under Iqbal will be imposed only where the supervisor directly participated in the alleged violation or had a hand in creating a policy or custom under which the unconstitutional practices occurred.

### a. OMH Commissioner Hogan

Magistrate Judge Peck found that Inesti's claim against Defendant Hogan for deliberate indifference to his mental health treatment is both time-barred, and unfounded because Hogan lacked personal involvement in Inesti's medical treatment at MPC and Kirby. Inesti's only objection to Magistrate Judge Peck's finding is the statement "Plaintiff objects to Paul A Crotty Ruling to grant summary judgment for Michael Hogan and Steven Rabinowiz lack of personal involvement [sic]."  This conclusory statement does not create a genuine dispute.  Accordingly, the Court reviews Magistrate Judge Peck's finding for clear error.

Magistrate Judge Peck found that during Inesti's incarceration at MPC from September 24, 2007 to November 23, 2007, Inesti sent one letter to Hogan, in which he complained that MPC nurses were injecting him with psychotropic medication without his consent. Inesti never received a response from Commissioner Hogan, and OMH has no record of Inesti's letter to Commissioner Hogan. During his incarceration at Kirby from

November 2008 to January 2009, Inesti did not complain to Hogan. As this Court previously explained in Soto v. Wright, 11 Civ. 2289, 2012 WL 639166 at *2 (S.D.N.Y. Feb. 28,2012), whether under the Colon or Iqbal test, one complaint letter is insufficient to establish the letter-recipient's personal involvement in the conduct complained of.

There is no clear error in Magistrate Judge Peck's findings regarding Inesti's claims against Commissioner Hogan.  The Court grants the State Defendants' motion for summary judgment.

### b. Rabinowitz

#### i. Deliberate Indifference Claims

Magistrate Judge Peck found that summary judgment should be granted in favor of Defendant Rabinowitz as to Inesti's deliberate indifference claims against him, due to Rabinowitz's lack of personal involvement in Inesti's medical treatment at MPC and Kirby. Inesti objects to Magistrate Judge Peck's finding by reasserting that: (1) Inesti wrote complaints in letters to Rabinowitz about Inesti's medical treatment, and Rabinowitz did not respond; (2) Rabinowitz gave Inesti a more lenient treatment plan than his original plan, showing Rabinowitz's personal involvement; and (3) Rabinowitz knew about Inesti's treatment under Dr. Tuzel, and did nothing about it.  These are the same arguments Magistrate Judge Peck considered and rejected.  Mere repetition does not create a factual dispute.  Accordingly, the Court reviews Magistrate Judge Peck's finding for clear error.

Inesti asserts that Rabinowitz is personally involved because of his complaint to Rabinowitz. (Dkt. No. 103: Inesti Opp. Br. ¶ 19.)  While at Kirby, Inesti wrote letters to Rabinowitz, but never spoke with Rabinowitz regarding his treatment.  As discussed previously in relation to Commissioner Hogan's personal involvement, letter complaints alone do not establish personal involvement. See Goris v. Breslin, 402 F.App'x 582, 584 (2d Cir. 2010).

Inesti's second objection cuts against his claim of deliberate indifference. Rabinowitz responded when Inesti complained to him about his treatment program and the alleged injections. Inesti admits that Rabinowitz "gave [him] the transitional services that [he] requested for a treatment plan." Inesti testified that he was "happy" with the transfer order. Inesti does not provide evidence that any mistreatment was directly related to the transitional services that he requested, and his claim does not meet the standard of deliberate indifference; to the contrary, the record shows Rabinowitz's concern in response to Inesti's claim.

Inesti's third objection fails because Rabinowitz was not personally involved with Inesti's treatment by Dr. Tuzel. Inesti fails to allege facts indicating that Rabinowitz was deliberately indifferent to a constitutional harm that Tuzel perpetrated against Inesti. Inesti claims only that he complained to Rabinowitz about the treatment he received from Tuzel; he does not show that Rabinowitz directly participated in giving Inesti medication without his consent. Further, he does not show that there was a policy or custom that Rabinowitz followed that led to a violation of his rights. As previously held, complaints do not establish personal involvement.

Furthermore, Inesti cannot establish that Rabinowitz was deliberately indifferent because the treatment that Tuzel provided was not improper. Inesti admits that, when he was unmedicated, he could become "violent" and "assaultive." (Inesti Tr. 93.) He testified: "I was really unstable, and Dr. Tuzel made a diagnosis of me. He checked me out. Then after that, they shove me up with a couple of needles a couple of times and I began to be more stable… I got back into reality." (Id.) Kirby records confirm the exigency of the situations under which Inesti was administered injections. See, e.g., Decl. of Tom Tuzel Ex. A: Inesti Medical Records 243 ("Mr. Inesti received Fluphenazine 5mg im x1, Lorazepam 2mg im x1 and Diphenhydramine 50mg im x1 earlier today after he became increasingly labile and

14

confrontational with staff.  The patients lability [sic] escalated posing a danger to himself and others, despite this writing MD and the 6 west teams [sic] attempts of verbal redirection, time out, and oral medication.  The patient after receiving the medication became less labile and agitated.  The patient was seen 30 minutes later on the treatment mall as well as later in the day in the activity room socializing with staff and peers.")  It is proper for a supervising doctor to defer to his medical staff in their decisions that a patient needs emergency medication.  Cuoco v. Moritsugu, 222 F.3d 99, 111-12 (2d Cir. 2000).

For the foregoing reasons and because there was no clear error in Magistrate Judge Peck's findings, the Court grants State Defendants' motion for summary judgment as to Inesti's deliberate indifference claims against Rabinowitz.

### ii. Retaliatory Transfer Claim

Magistrate Judge Peck recommended that summary judgment be granted in favor of Defendant Rabinowitz on Inesti's claims against him for retaliation.  Inesti reasserts the same arguments that Magistrate Judge Peck considered and rejected: (1) Rabinowitz transferred Inesti back to Riker's Island in retaliation against him; and (2) Inesti's quick transition from being sedated with psychotropic medicine to being transferred back to Riker's Island in the time from November 26, 2008 to January 5, 2009 proves Rabinowitz's retaliatory intent. Inesti does not refer to any specific documents or other evidence in the record that refutes or contradicts Magistrate Judge Peck's findings.  Accordingly, the Court reviews Magistrate Judge Peck's findings for clear error.

Both of Inesti's objections fail because Inesti has not established Rabinowitz's personal involvement in relation to his First Amendment retaliatory transfer claim. Inesti was admitted to Kirby, pursuant to a C.P.L. Article 730 Order on November 26, 2008 after being indicted and found unfit for trial. On January 5, 2009, Kirby forensic psychiatrists determined that Inesti was competent to stand trial. While normally Rabinowitz would sign a Notification

15

of Fitness to Proceed "based on the competency report of the defendant's treatment team at Kirby" (Rabinowitz Aff. ¶ 9.), in Inesti's case, Deputy Director Vinny Miccoli signed the notification. (Rabinowitz Aff. ¶ 10& Ex. A: Notification of Fitness to Proceed.)  This fact establishes Rabinowitz's lack of personal involvement in the transfer decision.  McQulkin v. Cent. N.Y. Psychiatric Ctr., No. 08-CV-975, 2010 WL 3765847 at *15 (N.D.N.Y. Aug. 27, 2010) (plaintiff's claim that the prison superintendent transferred him in retaliation fails because "the record reflects the decision was made by OMH care providers following an evaluation of plaintiff's mental status," not by the superintendent), report & rec. adopted, 2010 WL 3765715 (N.D.N.Y. Sept. 20, 2010).  Inesti further has not established a causal link between his complaints about treatment and his transfer, nor does he provide specific evidence that Rabinowitz harbored retaliatory intent.

There is no clear error in Judge Magistrate Peck's findings.  The Court grants State Defendants' summary judgment motion as to Inesti's retaliatory transfer claims against Rabinowitz.

### 2.  Inesti's Claims Against Dr. Tuzel

#### a.  Deliberate Indifference Claim

Magistrate Judge Peck recommends granting Dr. Tuzel summary judgment on Inesti's claims of deliberate indifference to medical need.  Inesti points to the following supposed dilemma: either Inesti required medical treatment for a legitimate mental illness, and Tuzel showed deliberate indifference in refusing to treat it (by diagnosing Inesti as "malingering") or Inesti did not suffer from a true mental illness, and Tuzel violated his rights by forcefully injecting him with medication.  Inesti does not refer to any specific documents or other evidence in the record that call Magistrate Judge Peck's findings into question.  Accordingly, the Court reviews Magistrate Judge Peck's findings for clear error.

Inesti alleges that Dr. Tuzel was deliberately indifferent to Inesti's mental health needs and that Dr. Tuzel injected him with psychotropic medication without Inesti's consent while Inesti was physically restrained.  Since Inesti was a pretrial detainee, his claim is analyzed under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment. See, e.g., Inesti v. Hicks, 11 Civ. 2596, 2012 WL 2362626 at *12 & n.21 (S.D.N.Y. June 22, 2012) (Peck, M.J.) (citing cases), report & rec. adopted, 2012 WL 3822224 (S.D.N.Y. Sept. 4, 2012) (Crotty, D.J.).

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law.  See 42 U.S.C. § 1983.  Establishing a § 1983 action requires a plaintiff to demonstrate that: (1) the alleged deprivation is "sufficiently serious," and (2) the charged official acted with a sufficiently culpable state of mind, Hathaway v. Coughlin,  99 F.3d 550, 553 (2d Cir. 1996).  In cases where treatment has been administered, as here, the first factor requires an objective analysis of whether the prisoner was actually deprived of adequate medical care, Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006), and whether that inadequacy presented the prisoner with a risk of serious harm, Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003) ("[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for these purposes.").  "The absence of adverse medical effects or demonstrable physical injury is one . . . factor that may be used to gauge the severity of the medical need at issue."  Id. at 187 (citation omitted).

The second factor in the test is subjective and requires a showing "that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d

17

Cir. 1998).  An inadvertent failure to provide adequate medical care does not constitute

deliberate indifference.  Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).  Furthermore, "a

complaint that a physician has been negligent in diagnosing or treating a medical condition

does not state a valid claim . . . . " Id. at 105-06.

Inesti argues that Dr. Tuzel was deliberately indifferent to his need for proper mental

health treatment: Dr. Tuzel "abrupt[]ly stopped plaintiff['|s medication causing plaintiff

sever[e] mental distress and pain" and falsely diagnosed Inesti with "malingering." (Inesti

Op. Br. at ¶¶ 6, 7, 15, 21.)  Since Dr. Tuzel initially prescribed medication to Inesti, Inesti

argues that Dr. Tuzel was deliberately indifferent by discontinuing Inesti's medication.

The record reflects that Inesti received medical treatment while at Kirby, which

included group therapy sessions directed by Dr. Tuzel (Buskin Aff. Ex. A: Inesti Dep. at 138-

39) and psychotropic medication, which Inesti consented to and received in January, 2009.

(State Defs. Rule 56.1 Stmt. ¶ 29.)  By January 14, 2009, Inesti's order for psychotropic

medication was discontinued, but Inesti continued to request and receive Risperidone.  (Tuzel

Aff. Ex. B: Inesti Med. Records at 249-50.)

Inesti disagrees with his treatment plan while at Kirby, but he fails to provide any

evidence that his mental health treatment or lack thereof resulted in an urgent threat to his

health or was so inadequate as to constitute deliberate indifference.  Aside from Inesti's

allegations that he urinated on himself as a result of his medications, which he does not

expound upon in the record, and his claims of wandering the streets after leaving state

custody, Inesti does not allege any specific harms from mistreatment.  The record instead

shows that any adverse consequences that may have resulted from a lack of treatment were

appropriately handled by Kirby staff before any harm actually occurred.  See, e.g., Decl. of

Tom Tuzel, Inesti 243 ("Mr. Inesti received Fluphenazine 5mg im x1, Lorazepam 2mg im x1

and Diphenhydramine 50mg im x1 earlier today after he became increasingly labile and

18

confrontational with staff.  The patients labality [sic] escalated posing a danger to himself

and others, despite this writing MD and the 6 west teams [sic] attempts of verbal redirection,

time out, and oral medication.  The patient after receiving the medication became less labile

and agitated.")

Since Inesti's claims do not satisfy the objective standard for deliberate indifference,

there is no need to discuss the second factor.  See, e.g., Goris v. Breslin, 402 F. App'x 582,

584 (2d. Cir. 2010) (reasoning that the Court need not reach the subjective prong of the test

for deliberate indifference where plaintiff failed to satisfy the objective factor).

Accordingly, the Court grants State Defendants' summary judgment motion as to

Inesti's deliberate indifference claims against Dr. Tuzel.

### b.  Forced Medication

Magistrate Judge Peck recommended granting Dr. Tuzel summary judgment on

Inesti's forced medication claim.  Inesti objects to Magistrate Judge Peck's finding, arguing

that Tuzel "intentionally and recklessly subjected Plaintiff to physical abuse at the hands of

other mental health staff when he ordered that Plaintiff's hands and feet be restrained and

Plaintiff receive a forceful injection of psychotropic medication" and arguing that Tuzel

admitted in an interrogatory that he ordered Inesti to receive such injections.  Again, these

arguments are conclusory allegations that do not address any particular finding on which

Magistrate Judge Peck's conclusion was based, so this Court reviews the R&R for clear error.

Magistrate Judge Peck acknowledges that the Due Process Clause of the Fourteenth

Amendment accords patients a liberty interest in avoiding unwanted administration of

antipsychotic drugs, Washington v. Harper, 494 U.S. 210, 221-22 (1990), but "it is well-

settled that a patient's liberty interest in not being involuntarily medicated is overridden in an

emergency, where failure to medicate forcibly would result in a substantial likelihood of

physical harm to that patient, other patients, or to staff members of the institution."  Odom v.

19

Bellevue Hosp. Ctr., 93 Civ. 2794, 1994 WL 323666 at *3 (S.D.N.Y. July 5, 1994); Kulak v.

City of N.Y., 88 F.3d 63, 74 (2d Cir. 1996).

When Inesti was injected with psychotropic medications, the record indicates the

existence of emergency situations.  Inesti received intramuscular medication without his

consent three times while at Kirby; Dr. Tuzel was involved in only one such administration.

On the day of this administration, Inesti became "'irritable,' 'loud,' and 'angry'" and went

into Tuzel's office yelling and screaming.  Inesti refused intramuscular medication.  Tuzel

decided to medicate Inesti against Inesti's will because Inesti's violent and hostile behavior

presented a danger to himself and others.  Inesti admits that the injections stabilized and

calmed him.  Inesti's violent behavior and the stabilizing effects of his medication were

consistent with other incidents in the record.  See, e.g., Tuzel Decl. Exhibit A: Inesti Med.

Records at 217 ("Mr. Inesti received Haloperidol 5mg im x1, Lorazepam 2mg im x1 and

Diphenhydramine 50mg im x1 yesterday after he became increasingly labile and

confrontational with staff and peers.  The patients labality [sic] escalated posing danger to

himself and others . . . The patient was seen this am denying any adverse effects of the

medication he received yesterday.").

Inesti's objections do not refute that he was forcibly medicated only during

emergencies.  There is therefore no dispute as to whether his rights were violated.  See

Anthony v. City of N.Y., 339 F.3d 129, 142 (2d Cir. 2003).  Furthermore, in the medical

context, a professional's judgment is presumptively valid.  Youngberg v. Romeo, 457 U.S.

307, 323 (1982).  "[A] doctor will not be liable under § 1983 for the treatment decisions [he]

makes unless such decisions are 'such a substantial departure from accepted judgment,

practice, or standards as to demonstrate that [he] actually did not base the decision on such

judgment.'" Kulak, 88 F.3d at 75.  Inesti has not provided evidence to overcome the

presumption that the medical judgment of Dr. Tuzel or Kirby staff was valid, nor has he

shown that Dr. Tuzel's decisions substantially departed from accepted practice.

Accordingly, the Court grants State Defendants' summary judgment motion as to

Inesti's forcible medication claim against Dr. Tuzel.

### D.  Inesti's Claims Against the City Defendants[3]

#### 1.  Conditions of Confinement

Magistrate Judge Peck recommended summary judgment in favor of Defendants

Dunbar and Pressley on Inesti's claims for unconstitutional conditions of confinement.  Inesti

repeats his general allegations that he was "denied food, clothing, showers and out of cell

relief" and his "personal property" while at MHAUII.  Inesti does not refer to any specific

documents or other evidence in the record that refute Magistrate Judge Peck's findings.

Accordingly, the Court reviews Magistrate Judge Peck's finding for clear error.

Pretrial detainees are protected by the Due Process Clause of the Fourteenth

Amendment, under which they may be subjected to "the restrictions and conditions of the

detention facility so long as those conditions and restriction do not amount to punishment, or

otherwise violate the Constitution."  Bell v. Wolfish, 441 U.S 520, 1872-73 (1979).

Punishment has been found when a correctional official denies a prisoner a necessity of life,

such as hygienic conditions or food, over a period of several months whenever that official

was working.  See, e.g., Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983)("[U]nder certain

circumstances a substantial deprivation of food may well be recognized as being of

constitutional dimension.").

---

[3] The City Defendants also assert that Inesti failed to administratively exhaust his grievances as required by the Prison Litigation Reform Act ("PLRA").  Since the Court is recommending the denial of Inesti's claims on the merits, it need not address whether Inesti complied with the PLRA.  See, e.g., Roseboro v. Gillespie, 791 F. Supp. 2d 353, 359 n.5 (S.D.N.Y. 2011) (Peck, M.J.).

Inesti asserts that while he was at Riker's Island Correctional Facility in a Special Housing Unit (SHU), he was "denied any right to eat, shower, or out of cell relief" and prevented from possessing personal property.  Inesti alleges that these deprivations and punitive segregation caused him to suffer "pain[,] humiliation [,] emotional distress [,] mental anguish [,] and physical injuries that limited [his] ability to eat[,] sleep[,] or work." (Dkt. No. 38: Compl. ¶ 138.)

For the reasons previously stated, Inesti's challenge to his conditions of confinement at MHAUII from November 16, 2006 to January 16, 2007 are time-barred.  To the extent that Inesti is asserting a claim that he was denied due process in being sent to MHAUII, that claim is precluded since it was first alleged after discovery ended.

Inesti was incarcerated at MHAUII from October 19, 2008 to November 26, 2008, but Inesti does not provide evidence to support his allegations for this time period. Magistrate Judge Peck was correct in excluding from consideration the three affidavits that Inesti provided in response to summary judgment after the close of discovery, since the Court warned Inesti that if he did "not produce the inmate affidavits [during discovery], he [would] be precluded from using them on the summary judgment motion" (Dkt. No. 76: 11/30/12 Order at 2.), and Inesti never made the affidavits available to Defendants.  Inesti does not object to this holding.  The Court adopts Magistrate Judge Peck's holding.

Inesti's claim against Defendants for failure to provide medication fails because the record establishes that correction officials do not provide medication to inmates; medication is provided by medical staff.  (City Defs. Rule 56.1 Stmt. ¶ 1; Dunbar Aff. ¶ 4.)

Inesti claims that he was denied food, showers, and recreation time, but fails to support his claim with any evidence beyond the excluded affidavits.  The logbook from Housing Area 13-A, which is in the record, shows Inesti was entitled to and offered three meals a day, regular sanitation, access to showers, and out-of-cell relief.  Deviations from

standard procedure would be noted in the logbook.  Inesti objects that the logbook shows that his name was only printed three times for recreation out of a 90 day period.  This objection is not enough to create a fact issue, since the assertion does not tend to prove that those were the only days that Inesti was offered recreation.  The logbook states the times that officers would offer recreation, and such officers wrote down the cell numbers of all inmates who accepted the offer, and note when all others refused.  See, e.g., Krill Decl. Ex. L at 30, 39, 43, 51.  Inesti's refusal to participate in recreation for the relatively short period of his confinement at MHAUII did not violate his rights.  See, e.g., Willard v. Ramsay, No. 07-CV-1156, 2010 WL 786296 at *3 n.10 (N.D.N.Y. Mar. 2, 2010) ("[Plaintiff's] access to, and refusal to accept, showers were the result of his own decisions and not unconstitutional conditions of confinement.  The same is true of his recreational time."); Gill v. Pact Org., 95 Civ. 4510, 1997 WL 539948 at *10 (S.D.N.Y. Aug. 28, 1997) (twenty-six days of administrative segregation with deprivation of exercise "does not state a claim for denial of a cognizable liberty interest").  While it is unlikely that prison logbooks would reflect the wrongful denial of a condition of confinement, Inesti does not challenge the logbook's accuracy, and his conclusory allegations without more are not enough to defeat City Defendants' motions for summary judgment.

Inesti claims that he was denied all of his "personal property[, including] pens, paper… and reading material." (Inesti Opp Br. ¶¶ 8, 9, 13, 23.)  Denial of such personal property, especially for a period of what was at maximum thirty-seven days (the length of Inesti's confinement in MHAUII), is not sufficiently serious to support a condition of confinement claim.  See, e.g., Stewart v. Howard, No. 09-CV-69, 2010 WL 3907137 at *3 (N.D.N.Y. Sept. 30, 2010) (denial of personal property was not sufficiently serious to sustain a condition of confinement claim).

Inesti also claims that he was denied adequate clothing, only receiving a smock. (Inesti Opp Br. ¶ 28.)  Inesti does not allege that this caused him any particular harm or pain, nor does he allege facts to show that this was imposed to inflict pain on him.  While wearing such a smock may be unpleasant, it does not rise to the level of a constitutional violation.  See, e.g., Reeder v. Hogan, No. 09-CV-520, 2012 WL 4107822 at *21 (N.D.N.Y. July 11, 2012) ("Plaintiff further alleges he was extremely cold, had only a short-sleeved green state shirt, no sheets [or] blanket . . . for six days. Such conditions may have been unpleasant for plaintiff, but he has failed to established an issue of fact as to if the conditions were wantonly imposed for the unnecessary infliction of pain or that they posed a threat to his health or safety." (citation & fns. omitted)), report & rec. adopted, 2012 WL 4106740 (N.D.N.Y. Sept. 19, 2012).

Inesti also asserts that he was denied showers, soap, and toothpaste.  Showers are offered daily. (City Defs. Rule 56.1 Stmt. ¶ 30)  Inesti does not provide evidence that he was regularly denied showers, soap, or toothpaste.  The logbook fails to note any deviations.  Inesti's conclusory allegations cannot overcome a motion for summary judgment.  See, e.g., Willard v. Ramsey 2010 WL 786296 ("[Plaintiff's] access to, and refusal to accept, showers were the result of his own decisions and not unconstitutional conditions of confinement. . . . 'Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers.'").

The Court grants the City Defendants' summary judgment motion as to Inesti's conditions of confinement claims against Dunbar and Pressley.

### 2.   Deliberate Indifference to Mental Health Treatment

Magistrate Judge Peck recommended granting summary judgment to Defendants Dunbar and Pressley on Inesti's claims against them for deliberate indifference to his need

for proper mental health treatment.  Since there is no objection to Magistrate Judge Peck's finding, the Court adopts it.

Inesti does not suggest that Dunbar and Pressley were involved in his mental health treatment.  The record establishes that correction officials do not provide medication to inmates; medication is provided by medical staff.  (City Defs. Rule 56.1 Stmt. ¶ 1.)  It was appropriate for Captains Dunbar and Pressley to defer to medical staff as to Inesti's treatment.  See, e.g., Hardy v. Diaz, No. 08-CV-1352, 2010 WL 1633379 at *7 (N.D.N.Y. Mar. 30, 2010) ("The Superintendant cannot be liable under Section 1983 for failure to supervise the prison medical staff, because he lacks the medical training and authority to do so.").

The Court grants the City Defendants' summary judgment motion as to Inesti's deliberate indifference claim against them.

## CONCLUSION

For the reasons stated above, Judge Magistrate Peck's R&R is adopted.  The Court grants the State Defendants' and City Defendants' motions for summary judgment.  The Clerk of Court is directed to enter judgment for Defendants and terminate the case.  Pursuant to 28 U.S.C 1915(a), I find that any appeal from this order would not be taken in good faith.


Dated: New York, New York
       September 20, 2013

                                        SO ORDERED

                                        _Paul A. Crotty_
                                        _____
                                        PAUL A. CROTTY
                                        United States District Judge


Copy by mail to:       Mark Inesti
                       10-A-1169
                       Great Meadow Correctional Facility, Box 51
                       Comstock, NY 12821-0051

25